INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS,
LOCAL 97, Plaintiff,

v.

NIAGARA MOHAWK POWER
CORPORATION,
Defendant.

No. 95–CV–1472 (FJS).

United States District Court,
N.D. New York.

Dec. 27, 1996.

---

Blitman & King, Syracuse, New York, for Plaintiff (Donald D. Oliver, of counsel).

Bond, Schoeneck & King, Syracuse, New York, for Defendant (Stephen J. Vollmer, of counsel).

## MEMORANDUM–DECISION AND ORDER

SCULLIN, District Judge.

Plaintiff,. International Brotherhood of Electrical Workers, Local 97 ("Local 97"),[1]

---

**1.** Local 97 is the collective bargaining representative of a bargaining unit consisting of hourly

paid production, maintenance, non-technical, of-

commenced this action against defendant, Niagara Mohawk Power Corporation ("Niagara Mohawk"),[2] pursuant to 29 U.S.C. § 185,[3] to confirm the July 23, 1995 arbitration award rendered by a tripartite arbitration panel (the "Award"). Niagara Mohawk counterclaimed to vacate the Award on the grounds that it violates public policy. Plaintiff moves for summary judgment to confirm the Award, dismiss Niagara Mohawk's counterclaim, and seeks an award of attorneys' fees and costs. Niagara Mohawk cross-moves for summary judgment to vacate the Award, dismiss the complaint in its entirety, and seeks an award of costs and fees.

## BACKGROUND

The underlying dispute involves Niagara Mohawk's decision to discharge employee Patrick J. Rando ("grievant"), who was employed in Niagara Mohawk's Nuclear Division under a collective bargaining agreement between Niagara Mohawk and Local 97.[4] Grievant was hired by Niagara Mohawk on January 19, 1988 to work in the Nuclear Division at Nine Mile Point nuclear power plant in Lycoming, New York as a radiation protection technician. At the time he was discharged grievant held the position of Chemistry Technician at Nine Mile Point, Unit 2.

As a Chemistry Technician, grievant was responsible for ensuring that the plant chemistry was maintained within the technical specifications required by the Nuclear Regulatory Commission ("NRC"). In particular, grievant was charged with "test[ing] air effluence, influence, water effluence, pump oils, [and] things of that nature." Award at 4. To perform these duties, grievant was granted unescorted access to areas of the facility that are considered to be critical to the safe operation of a nuclear power plant.

On February 4, 1993, grievant was asked to produce a urine specimen in accordance with the random drug screening mandated by the NRC Fitness For Duty Program regulations.[5] In accordance with Niagara Mohawk's Nuclear Division drug testing, prior to submitting to the drug test, grievant certified "that the urine specimen to be provided by me is mine and not adulterated or altered in any manner." [6] Award at 4. Grievant then provided a urine sample. Later that day, Robert LaDue, Niagara Mohawk's General Supervisor of Labor Relations for the Nuclear Division, was contacted by the Fitness For Duty technician who had tested grievant's sample. The technician told La-

fice and clerical employees of Niagara Mohawk. Pl. Local Rule 7.1(f) Statement ¶ 3.

2. Niagara Mohawk is a supplier of electrical power and natural gas to residential and commercial customers throughout upstate New York. D. Local Rule 7.1(f) Statement ¶ 1.

3. Federal jurisdiction in this case is premised upon section 301(1) of the Labor Management Relations Act, codified at 29 U.S.C. § 185(a). The statute provides:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

4. Niagara Mohawk and Local 97 have been parties to a series of collective bargaining agreements governing the terms and conditions of employment for employees in the collective bargaining unit represented by Local 97. Pl. Local Rule 7.1(f) Statement ¶ 4. The agreement rele-

vant in this case was effective June 1, 1990 through May 31, 1993 ("Agreement"). See King Aff.Ex. A.

5. In November, 1988, Local 97 and Niagara Mohawk agreed upon an "Alcohol/Drug Testing—Fitness for Duty Program" which included testing protocol, penalties for offenders, and opportunities for rehabilitation. Award at 3. This program applied to all represented employees, including those in nuclear operations. Id.

The program complied with NRC regulations which require licensees authorized to operate a nuclear power reactor, such as Niagara Mohawk, to implement a Fitness For Duty Program applicable to all persons granted unescorted access to protected areas. 10 C.F.R. § 26.20. As part of a licensee's Fitness for Duty Program, unannounced drug tests may be imposed in a random manner. 10 C.F.R. § 26.24.

6. The consent form grievant signed also contained the following language: "I further understand that these results, or my lack of cooperation in providing a sample shall be used to make decisions regarding my access to nuclear facilities."

Due that the urine sample had a strong odor of chlorine. Subsequent tests and laboratory analysis of the specimen confirmed the presence of chlorine.

On February 5, 1993, grievant produced a second urine specimen under observation and this sample tested positive for cocaine. Later that day, during a meeting with a Local 97 representative and LaDue, grievant admitted that he had adulterated the first urine specimen, but denied that he had ever used illegal drugs. A subsequent search of grievant's locker revealed a ten ounce bottle of chlorine solution, a small vile of urine, and another small vial of chlorine solution.

On February 8, 1993, a disciplinary meeting under Article XVI of the collective bargaining agreement was held among grievant, representatives of Local 97, and Niagara Mohawk. During this meeting, grievant admitted that he was a drug abuser, but requested leniency during the proceeding. Nevertheless, Niagara Mohawk terminated grievant that day "on the basis of [1] his intentional behavior to defraud the company as far as his drug test was concerned and [2] his falsification of the document when he certified that it was not altered in any way." Award at 5.

Local 97 filed a grievance, challenging Niagara Mohawk's decision to discharge grievant. (Grievance No. 21–N–93). The parties were unable to resolve the grievance, and therefore, pursuant to Article XXII of the Agreement, entitled "Grievances," the matter was submitted to arbitration. Arbitration hearings were held on July 1, November 29, December 21, 1994 and February 16, 1995, before a tripartite panel consisting of neutral arbitrator Tia Schneider Denenberg, Local 97 arbitrator Alex T. Kurilovitch, and Niagara Mohawk arbitrator Richard L. Byrnes (the "Panel").[7]

On July 23, 1995, the Panel issued, over the dissent of Byrnes, its opinion and award, finding that grievant had been terminated without just cause.[8] The Panel found that grievant did not have full and unmistakable notice of the disciplinary penalty which was "alien to the concept of due process," one of the "first of the canonical seven tests" of just cause. Award at 9. In addition, the Panel found that the consent form could not be likened to a falsified work record because the "offense occurred subsequently when, in turning in an adulterated sample, [grievant] failed to comply with the undertaking he gave on the form—a failing akin to insubordination." *Id.*

The Panel ordered that the grievant be reinstated, with back pay from the date of discharge to the date of reinstatement, less eighteen months, provided that he produce a negative drug test and satisfy any requirements that may be imposed by Niagara Mohawk's Employee Assistance Program following an evaluation. Despite the Award, Niagara Mohawk has refused to reinstate the grievant or render back pay as required by the Award.

Plaintiff commenced this action on October 13, 1995, seeking confirmation of the Panel's decision, as well as costs and reasonable attorney's fees. Defendant contends that the Award violates public policy and seeks vacatur of the Award. As stated, presently before the Court is plaintiff's motion for summary judgment to confirm the Award and dismiss defendant's counterclaim, and defendant's cross-motion for summary judgment to vacate the Award.

## DISCUSSION

Under Rule 56(c), summary judgment is warranted if, when viewing the evidence in a light most favorable to the non-movant, the

---

7. The parties stipulated that the issue to be decided by the Panel was: "Did the Company have just cause for the discharge of grievant, Patrick Rando? If not, what shall the remedy be?"

8. When determining whether just cause for termination exists, several factors are to be considered by the arbitrators. These include, but are not limited to the following: (1) whether the employee was afforded due process and could be

expected to know his conduct would subject him to discipline; (2) whether the employer's actions were non-discriminatory; and (3) whether the penalty is reasonably related to the seriousness of the offense and/or the employee's record with the employer. F. Elkouri & E.A. Elkouri, *How Arbitration Works*, 670–86 (4th ed. 1985). The weight given to these factors varies from case to case. *Id.*

court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 457, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Commander Oil v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir.1993). A genuine issue of material fact is one that a reasonable fact finder could decide in favor of either party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Court is mindful that it must view the evidence in a light most favorable to the non-movant, drawing all reasonable inferences and resolving ambiguities in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

Where, as here, cross motions for summary judgment are before the Court:

neither side is barred from asserting that there are issues of fact sufficient to prevent the entry of judgment as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgement as a matter of law for one side or the other. "Rather the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."

*Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (quoting *Schwabenbauer v. Board of Educ.*, 667 F.2d 305 (2d Cir.1981)).

## A. Authority to Review an Arbitration Award

■ Courts have a limited role when asked to review the decision of an arbitrator. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 369–70, 98 L.Ed.2d 286 (1987). Courts are not authorized to reconsider the merits of an award because this would undermine the federal policy of settling labor disputes by arbitra-

tion. *Id.; Newsday, Inc. v. Long Island Typographical Union*, 915 F.2d 840, 844 (2d Cir.1990), *cert. denied*, 499 U.S. 922, 111 S.Ct. 1314, 113 L.Ed.2d 247 (1991). An arbitrator's award is enforceable so long as it "draws its essence from the collective bargaining agreement and is not based on the arbitrator's "own brand of individual justice." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). The Second Circuit has repeatedly held that an award will not be vacated, "even if the arbitrator's interpretation of the contract is clearly erroneous, so long as such Award is explained in terms that offer even a barely colorable justification for the outcome reached."[9] *Hygrade Operators, Inc. v. ILA Local 333*, 945 F.2d 18, 22 (2d Cir.1991) (citation omitted); *In re New York Typographical Union No. 6*, 878 F.2d 56, 60 (2d Cir.1989); *In re Marine Pollution Service, Inc.*, 857 F.2d 91, 94 (2d Cir.1988).

■ A court may, however, refuse to enforce an award pursuant to a collective bargaining agreement if the award is contrary to public policy. *Misco*, 484 U.S. at 42–43, 108 S.Ct. at 373; *Newsday*, 915 F.2d at 844. This exception is a specific application of a more general doctrine, rooted in common law, that a court may refuse to enforce contracts that violate law or public policy. *Misco*, 484 U.S. at 42–43, 108 S.Ct. at 373; *Newsday*, 915 F.2d at 844; *see W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983); *Hurd v. Hodge*, 334 U.S. 24, 34–35, 68 S.Ct. 847, 852–53, 92 L.Ed. 1187 (1948). However,

a court's refusal to enforce an arbitrator's *interpretation* of such contracts is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest.

---

**9.** The Second Circuit's interpretation is wholly consistent with the Supreme Court which held that "[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Misco*, 484 U.S. at 38, 108 S.Ct. at 371.

*Misco,* 484 U.S. at 43, 108 S.Ct. at 373 (emphasis in original) (citations omitted).

■ Although reviewing courts must ordinarily accept an arbitrator's findings of fact, in addressing public policy concerns, the courts are not to defer to the arbitrator, but rather consider these issues *de novo* because "the question of public policy is ultimately one for resolution by the courts." *Misco,* 484 U.S. at 43, 108 S.Ct. at 373–74; *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183–84; *Newsday,* 915 F.2d at 844; *Iowa Elec. Light & Power Co. v. Local Union 204,* 834 F.2d 1424, 1427 (8th Cir.1987); *E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Ass'n,* 790 F.2d 611, 617 (7th Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986).

Courts have routinely vacated arbitrators' awards interpreting labor agreements where, in the view of the Court, an explicit and dominant public policy was violated. *See, e.g., Local 1. Amal. Lithographers v. Stearns and Beale,* 812 F.2d 763 (2d Cir.1987) (National Labor Relations Act); *Exxon Shipping Co. v. Seamen's Union,* 11 F.3d 1189 (3d Cir.1993) (operating oil tanker under influence of alcohol); *Gulf Coast Industrial Workers Union v. Exxon Co.,* 991 F.2d 244 (5th Cir.), *cert. denied,* 510 U.S. 965, 114 S.Ct. 441, 126 L.Ed.2d 375 (1993) (drug use by petroleum refinery technician); *Exxon Corp. v. Baton Rouge Oil,* 77 F.3d 850 (5th Cir.1996) (drug use by a supervisor in a safety-sensitive position); *Delta Air Lines v. Air Line Pilots Ass'n Int'l,* 861 F.2d 665, 674 (11th Cir.1988); *cert. denied,* 493 U.S. 871, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989) (flying airplane under influence of alcohol).

As previously set forth, the grievant in the present case was employed in a nuclear power plant. The defendant claims he was terminated because of certain misrepresentations and/or false statements he made with respect to company administered drug tests. The defendant asserts that such conduct is in violation of clearly stated safety regulations and policies concerning the operation of nuclear facilities and that the grievant's conduct necessarily implicates public policy. *Iowa Elec.,* 834 F.2d at 1427 (violating nuclear safety regulations).

**B. NRC Safety Rules and Regulations vis-a-vis Public Policy**

Since the enactment of the Atomic Energy Act and the creation of the NRC, the federal government has promulgated volumes of statutes and rules that govern safety in the nuclear power context. *See, e.g.,* 42 U.S.C. §§ 2131–41; 10 C.F.R. Part 50. The extensive involvement by the federal government in every aspect of the planning, construction, and operation of nuclear power plants reflects the level of public concern over the safety of the nuclear power industry. ·Furthermore, the public policy in favor of nuclear safety is highlighted by Congress's decision to authorize a specific agency, the NRC, to oversee and ensure nuclear safety. *Iowa Elec.,* 834 F.2d at 1427 n. 2; *see also Exxon Shipping Co. v. Exxon Seamen's Union,* 993 F.2d 357, 362 (3d Cir.1993) (existence of Coast Guard evidences significance of maritime safety policy).

■ The NRC regulations represent "a strict regulatory scheme devised by Congress for the protection of the public from the hazards of nuclear radiation." *Iowa Elec.,* 834 F.2d at 1428. There is a dominant and well-defined public policy "requiring strict adherence to nuclear safety rules." *Id.* at 1427. Public policy favoring strict adherence to nuclear safety regulation is firmly rooted in law. *Iowa Elec.,* 834 F.2d at 1427; *Daniel Construction Co. v. Local 257, IBEW,* 856 F.2d 1174 (8th Cir.1988), *cert. denied,* 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 200 (1989); *BPS Guard Services, Inc. v. Int'l Union, United Plant Guard Workers,* 735 F.Supp. 892, 894 (N.D.Ill.1990). The Eighth Circuit has summarized public policy in the nuclear arena:

The Supreme Court has recognized the critical role of this federal safety system for nuclear power plants: "The Commission's prime area of concern in the licensing context ... is national security, public health, and safety." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 550, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978) (citing 42 U.S.C. §§ 2132, 2133, 2201). The "regulatory scheme ... is 'virtually

unique in the degree to which broad responsibility is reposed in the [NRC]....'" *Carstens v. NRC,* 742 F.2d 1546, 1551 (D.C.Cir.1984) (quoting *Siegel v. AEC,* 400 F.2d 778, 783 (D.C.Cir.1968)), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985). Nothing could be plainer than the public interest in the safe operation of nuclear power plants that underlies this panoply of federal regulations. *Iowa Elec.,* 834 F.2d at 1428; *see also Daniel Construction Co.,* 856 F.2d 1174 (clear public policy exists in favor of safety and security at nuclear power plants).

In *Iowa Electric,* the Eighth Circuit considered the public policy implications of NRC regulations in reviewing an arbitration award. There, a machinist working in the nuclear power plant's secondary containment area was terminated for deliberately violating a safety regulation. *Iowa Elec.* at 1425. The employee's work area was kept pressurized, through a series of interlock doors, to ensure that any leakage would remain inside the plant. *Id.* The employee had his leg in a cast and wanted to leave early to avoid the lunch crowd. *Id.* After learning that the interlock was properly activated, the employee requested permission from the control room to defeat the system, which was refused. *Id.* Nevertheless, the employee instructed a foreman to disconnect the fuse. Thus, "[the employee] deliberately defied the control room engineer, defeated the interlock system, and flouted federally-mandated safety regulations." *Id.*

The employee was terminated and arbitrators ordered the company to reinstate him, finding that he was not aware that "the situation was as grave a matter as that claimed by the company" and that "the various training sessions ... did not address the door problem ... that specifically ..." *Iowa Elec.* at 1426. The Court vacated the reinstatement, stating that it was "not concerned with what [the employee] says he did not know about the details of secondary containment. It is enough that he did know that he was short-circuiting an important safety system required by the federal government as a measure to protect the public from exposure to harmful radiation." *Id.* The Court held that "[its] decision today is in keeping with the line of cases vacating arbitrator's awards that direct the reinstatement of employees whose deliberate acts have jeopardized public health or safety," stating that "nothing could be plainer than the public interest in the safe operation of nuclear power plants that underlies th[e] panoply of federal regulations." *Id.* at 1428.

In the context of the present case, the Court notes that the NRC has promulgated detailed requirements regarding drug and alcohol testing of employees in its Fitness For Duty Programs. 10 C.F.R. Part 26.[10] These regulations require all nuclear power plant operators to have a written policy in place and to perform random drug testing on all nuclear personnel who have unescorted access to protected areas of nuclear plants. The NRC's Fitness For Duty Regulations have three stated objectives: (1) to provide reasonable assurance that nuclear power plant personnel "will perform their tasks in a reliable and trustworthy manner;" (2) to provide "reasonable measures for the early detection of persons who are not fit to perform activities [under NRC regulations];" (3) to achieve a "drug-free workplace and a workplace free of the effects of such substances." [11] 10 C.F.R. § 26.10. In addition, NRC regulations provide that individuals

---

10. 10 C.F.R. Part 26 provides:

Fitness For Duty Programs must:
(a) Provide reasonable assurance that nuclear plant personnel ... will perform their tasks in a reliable and trustworthy manner and are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties...."

11. Defendant argues that there is a well-defined public policy against the use of drugs in the workplace. In support of this proposition, various federal statutes which mandate such a policy are cited. *See e.g.,* 1988 Drug–Free Workplace Act, 41 U.S.C. § 701–707; Drug Free Schools and Communities Act, and the Controlled Substances Act, 21 U.S.C. § 801(2). In addition, several governmental regulations are referred to bolster this notion. *See e.g.,* 10 C.F.R. Part 26 (NRC Fitness For Duty Programs); 49 C.F.R. Part 219 (Federal Railroad Administration drug and alcohol testing regulations). This, however, is not a core issue in the case because grievant was not terminated for the use of drugs in the workplace.

granted unescorted access to protected areas within the nuclear power plant must be "trustworthy and reliable," and "not constitute an unreasonable risk to the health and safety of the public." 10 C.F.R. § 73.56(b)(1).

The NRC regulations are buttressed by Niagara Mohawk company policies which conform to federal regulations such as its Nuclear Division Directive, which implements its own "Alcohol/Drug Testing Fitness For Duty Program." Under the program, any employee who, as a condition of his job, has unescorted access to the nuclear site is subject to alcohol/drug testing.[12]

■ In light of the foregoing, the Court finds that federal statutes, regulations, and case law support a finding of a well-defined and dominant public policy against employment of individuals who deliberately violate nuclear safety rules and cannot meet NRC standards of trustworthiness and reliability.[13] Given the strong public policy issues involved, the Court will review the findings of the arbitration panel de novo.

**C. Grievant's Conduct**

■ The Second Circuit has yet to address the public policy issues involved in an arbi-

tration panel's reinstatement of an employee who violated NRC safety regulations. However, the Court finds the decision of the Eight Circuit in *Iowa Electric* instructive. As stated, in *Iowa Electric*, the court concluded that the employer had "just cause" to terminate an employee where the employee knew he was "short circuiting an important safety system required by the federal government." *Id.* at 1426.

Similarly, the grievant in this case planned to defeat the NRC's Fitness For Duty drug testing procedures to conceal his cocaine use and continue working at the facility. Moreover, as a Chemistry Technician in the nuclear facility, grievant was responsible for certifying that the power plant chemistry was maintained within the NRC safety regulations. Award at 4. Thus, contrary to plaintiff's allegations, grievant's position is directly related to the safety of the public and is indistinguishable from the machinist's position in *Iowa Electric.*

In the present case, the arbitration panel's majority decision rested in part on their perception that the grievant here was not afforded due process. The majority found that the

---

**12.** 10 C.F.R. 26.20 provides:
Written policy and procedures.
[A]s a minimum, written policies and procedures must address fitness for duty through the following;
   (a) An overall description of licensee policy in fitness for duty. The policy must address use of illegal drugs and abuse of legal drugs. Written policy documents must be in sufficient detail to provide affected individuals with information of what is expected of them, and what consequences may result from lack of adherence to the policy.
Niagara Mohawk's Nuclear Division Directive provides in part (references are to the Code of Federal Regulations):
3.2 General Conditions for Fitness for Duty Policy Violations
   3.2.1 Violations of the Fitness for Duty Policy shall be subject, as applicable, to the mandatory sanctions required by this directive. Each violation shall consider the following items:
   a. Appropriate suspension of unescorted access. 10 CFR 26.27(1)
   b. Appropriate disciplinary action up to and including discharge.
   c. Assessment of the need for periodic follow-up drug and alcohol testing after access

reinstatement or return to work, as applicable. 10 CFR 26.24(a)(4)
   d. Determination of the need to review and evaluate the individual's past-safety related work. 10 CFR 26.20(d)
   e. Determination of whether the individual represents a security or safety risk.
   3.2.2 Refusal to submit to the drug and alcohol test required by this directive shall be treated as a positive test and shall result in the appropriate management sanctions. 10 CFR 26.27(c)
   3.2.3 Alteration or interference with the proper collection of samples or conduct of tests shall be treated as a positive test and shall result in appropriate management sanctions.

**13.** Although public policy is to be determined by examining statutes and regulations, an arbitration award need not violate positive law or regulations before vacatur is appropriate. *See Newsday,* 915 F.2d at 845; *Union Pacific Railroad Co. v. United Transp. Union,* 3 F.3d 255, 262 (8th Cir.1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 881, 127 L.Ed.2d 76 (1994); *Iowa Elec.,* 834 F.2d at 1429.

grievant did not have "full and unmistakable notice of the disciplinary penalty" for his actions, which was "alien to the concept of due process." Award at 9. However, the regulations and policies regarding drug testing are well documented, and the grievant was fully aware of them by virtue of his employment.[14] Under Niagara Mohawk's program, all employees subject to drug testing are required to complete and sign a prescribed form, which states in part that "any employee who refuses to complete and sign the required forms or to provide a specimen for testing will immediately become subject to the disciplinary procedure of Article XVI of the parties' labor agreement."[15]

The panel decision also noted that Mr. LaDue, a Niagara Mohawk representative, stated that initial and yearly employee training emphasizes that falsification of documents "will result in disciplinary action and could result in criminal prosecution." Award at 6. Yet, the majority of the panel concluded that there was no evidence that the training provided to the employees made them aware that "adulteration" of a urine sample would be equivalent to a "falsification" of a work document, stating that "the link is by no means self evident."[16] Id. at 9. Therefore, the majority of the Panel found that the grievant's behavior in providing a false urine sample constituted "insubordination" rather than "falsification." Id.

The insubordination versus falsification distinction set forth by the Panel's majority, in terms of notice to the grievant of the possible consequences of his actions, is unconvincing.[17] Clearly the certification by the employee on the consent form is operative each and every time a drug sample is produced, otherwise it would have no meaning.[18]

---

14. See note 12.

15. Article XVI of the Collective Bargaining Agreement, entitled "Disciplinary Action" provides in part:
   1. When an employee who is a member of the Brotherhood is charged with a violation of Company rules or procedures, the facts and circumstances involved will be discussed and reviewed with the appropriate Brotherhood representatives before any action involving loss of pay is taken....

16. The panel found that the signing of the consent form could not be likened to the falsification of a work record because "the offense occurred subsequently when in turning in an adulterated sample, he failed to comply with the undertaking he gave on the form—a failing akin to insubordination." Award at 9.

17. The panel decision held "although some kinds of insubordination might be serious enough to justify termination, insubordination does not always impugn the employee's character, as falsification does, or result in discharge. Whereas falsification calls into question an employee's integrity, insubordination is typically a matter of degree and context." Award at 10. In a footnote, the panel added, "there are also technical reasons for considering the grievant's particular form of adulteration—contaminating the sample with a chlorine compound—insubordinate, rather than dishonest. Chlorine is a notorious and readily detectible contaminant; the odor alone alerted the technicians who handled the Rando sample. His adding chlorine is more properly viewed as thwarting the test by spoiling the sample—that is, a form of conduct that invites discipline under the rubric of insubordination." Id. at note 7. This analysis by the Panel ignores the "dishonest" further acts of grievant in continuing to deny his drug use. Furthermore, the Court cannot agree that grievant's lack of skill in thwarting the drug test makes his conduct any less "dishonest."

18. Prior to providing the urine sample, grievant signed a consent form which contained the following:
   [T]he undersigned ... do hereby authorize the testing of my breath and urine for fitness for duty purposes. I understand and agree that the results of any such testing will be turned over to Niagara Mohawk Power Corporation and to other licensee, and/or to my employer's management on a need to know basis as required by the NRC Fitness for Duty Rule (10CFR26) and Niagara Mohawk policy and procedure.... I further understand that these results, or my lack of cooperation in providing a specimen shall be used to make decisions regarding my access to nuclear facilities.... I Certify that the urine sample to be provided by me is mine and not adulterated or altered in any manner....
   As stated, the arbitration panel majority found that grievant's adulteration of the urine sample was merely insubordination and not a reflection on grievant's tendencies towards trustworthiness and reliability. The Panel failed to discuss the implications of the submission of the misrepresentations by the grievant on the consent form vis-a-vis his trustworthiness and reliability. The certification on the consent form represents a promise to produce an unadulterated urine sample. The grievant then submitted an adulterated sample and attempted to conceal it from the company. Such conduct does not support a finding of trustworthiness or reliability.

A reasonable person in the grievant's employment position would be on notice that violating the federally mandated drug policy set forth by Niagara Mohawk, adulterating a urine sample, falsifying a certification that he would not adulterate his urine sample, and falsely denying illegal drug use could result in termination.[19] The Court finds little relevance in the Panel's classification of plaintiff's wrongful conduct as "insubordination" rather "falsification of work documents," particularly in light of the public policy interests of trustworthiness and reliability in nuclear facility employees.

Grievant's conduct supports a finding that he is neither trustworthy or reliable as required by the NRC regulatory scheme implemented by Niagara Mohawk. First, grievant used cocaine, conduct which the NRC's Fitness For Duty Regulations are specifically designed to prevent. Grievant then engaged in a scheme to circumvent the regulations by adulterating his urine sample,[20] and falsely certified that he would not alter the specimen provided. When confronted with the test results, grievant eventually admitted that he had adulterated his urine sample as an experiment for future use, but continued to deny ever using illegal drugs.[21] These actions by the grievant are substantial evidence that grievant can no longer be considered trustworthy or reliable, at least to the degree required to hold the position of chemistry technician at a nuclear power plant. Such behavior is a clear violation of the NRC Fitness For Duty regulations, as well as Niagara Mohawk's company policies. The Court therefore finds that the reinstatement of grievant would contravene public policy requiring strict adherence to nuclear safety rules. Defendant's cross-motion for summary judgment must be granted and the Award vacated.

### D. Attorneys' Fees

Local 97 seeks an award of attorneys' fees on the basis that Niagara Mohawk's refusal to comply with the arbitration award was without justification. As stated, defendant's cross-motion for summary judgment is granted and the Award is vacated. Therefore, plaintiff was unsuccessful in this action and is not entitled to attorneys' fees.

Niagara Mohawk has also moved for an award of attorneys' fees. Under the prevailing American rule, in a federal action, attorney's fees cannot be recovered by the successful party in the absence of statutory authority for the award. *Alyeska Pipeline Service Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Pursuant to its inherent equitable powers, however, a court may award attorney's fees when the opposing counsel acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *International Chemical Workers v. BASF Wyandotte Corp.,* 774 F.2d 43, 47 (2d Cir. 1985) (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). As applied in suits for the confirmation and enforcement of arbitration awards, "the guiding principle has been stated as follows: 'when a challenger refuses to abide by an arbitrator's decision without justification, attorney's fees and costs may be properly be awarded.'" *International Chemical*

---

**19.** The panel, in an appendix to its award, recognized background documents to the Alcohol/Drug Testing Fitness For Duty Program at Niagara Mohawk. Among these documents, a "Company Drug Testing Information and Instruction Sheet" contained the following caution:

> "any adulteration or switching or urine by an employee will be considered insubordination and will result in disciplinary action up to and including discharge."

**20.** The panel found that there was no evidence to support a conclusion that grievant's conduct was planned *well in advance.* However, there is evidence that *some type* of plan existed because (i) upon inspection of his locker, a ten ounce bottle of chlorine, a small vial of urine, and another small vial of chlorine was discovered; and (ii) LaDue stated during the arbitration hearing that "nuclear employees with unescorted access to the site ... [receive] no more than two hours notice [of a random test]." Award at 5.

**21.** The panel found that during a meeting with LaDue and a union representative, according to LaDue, grievant stated that he had adulterated the urine specimen "to test the system, to determine if it was possible for the technician to see if he had altered it.... [Moreover,] he stated that he wanted to do this in case he might need it in the future." Award at 5. Grievant later admitted that he had a substance abuse problem.

*Workers,* 774 F.2d at 47 (quoting *Bell Production Engineers Ass'n v. Bell,* 688 F.2d 997, 999 (5th Cir.1982)). The Court finds that an award of attorneys' fees is not warranted in this case.

**CONCLUSION**

After carefully considering the record, the papers submitted by counsel, counsel's arguments, and the relevant law, it is hereby

**ORDERED** that plaintiff's motion for summary judgment is **DENIED;** that defendant's cross-motion for summary judgment is **GRANTED;** and the Arbitration Award is **VACATED.** It is further

**ORDERED** that plaintiff's motion for attorney's fees is **DENIED;** and defendant's motion for attorney's fees is also **DENIED.** Finally, it is further

**ORDERED** that the complaint is dismissed in its entirety.

**IT IS SO ORDERED.**