**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 97, Plaintiff–Appellant,**

v.

**NIAGARA MOHAWK POWER CORPORATION, Defendant– Appellee.**

No. 363, Docket 97–7113.

United States Court of Appeals, Second Circuit.

Argued Aug. 28, 1997.

Decided May 8, 1998.

Donald D. Oliver, New York City (Blitman & King), for Plaintiff–Appellant.

Robert W. Kopp, Syracuse, NY (Bond, Schoeneck & King), for Defendant–Appellee.

Before: KEARSE and McLAUGHLIN, Circuit Judges, and TRAGER, District Judge.*

TRAGER, District Judge:

In this case we revisit the question of reconciling the proper role of the courts and of labor arbitrators where a claim is made that a labor arbitration award should not be enforced because it contravenes public policy. The factual context, nuclear safety, is one that this Court has not confronted before, and one which makes the issue more difficult than it otherwise might be.

Plaintiff-appellant, International Brotherhood of Electrical Workers, Local 97, appeals from a judgment of the United States District Court for the Northern District of New York vacating an arbitration award which ordered the conditional reinstatement of Patrick Rando, a technician at a nuclear power plant owned by defendant-appellee Niagara Mohawk Power Corporation. Rando was discharged after he adulterated a drug test and subsequently tested positive for cocaine. On appeal, plaintiff argues that enforcement of the arbitration award reinstating Rando would not violate public policy and that the district court exceeded its reviewing power in setting aside the arbitration award. We conclude that public policy here is defined by the regulations of the Nuclear Regulatory Commission and that the arbitration panel's award of conditional reinstatement, following rehabilitation, does not violate public policy as defined by those regulations. We also conclude that the district court impermissibly employed a *de novo* standard when reviewing the arbitration panel's factual findings. Accordingly, the district court erred in vacating the arbitration award and we reverse.

## Background

Defendant Niagara Mohawk Power Corporation ("Company") is engaged in the business of generating and supplying electrical power and supplying natural gas to residential and commercial users throughout upstate New York. Among the facilities operated by the Company are two nuclear power plants located at Nine Mile Point in Lycoming, New York. Plaintiff International Brotherhood of

* The Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

Electrical Workers, Local 97 ("Union") is the collective bargaining representative for a bargaining unit consisting of hourly paid production, maintenance, non-technical, office and clerical employees of Niagara Mohawk. The Company and the Union (and the Union's predecessor local unions affiliated with the International Brotherhood of Electrical Workers) have been parties to a series of collective bargaining agreements concerning the terms and conditions of employment for employees in the collective bargaining unit which included Rando.

The events which preceded Rando's discharge are essentially undisputed. At the time of his discharge, Rando was employed as a chemistry technician at the Company's Nine Mile Point, Unit 2 plant, a position he held for approximately four and a half years. As a chemistry technician, Rando was responsible for ensuring that the plant chemistry was maintained within the technical specifications required by the federal Nuclear Regulatory Commission ("NRC"), including testing "air effluence, influence, water effluence, pump oils" and other related activities. Opinion and Decision of the Arbitration Panel ("O & D") at 4. Prior to the incident that ultimately would give rise to this appeal, Rando had a clean disciplinary record.

As a nuclear power plant operator, Niagara Mohawk is required to comply with extensive regulations promulgated by the NRC. The regulations are designed to ensure the safety of nuclear power plant workforces and the public at large. One of the NRC regulations mandates that nuclear power plants maintain "Fitness For Duty Programs" which provide for random drug screening of employees. See 10 C.F.R. §§ 26.1, 26.27. On February 4, 1993, pursuant to the Company's Fitness for Duty Program, Rando was selected on a random basis to provide a urine sample for testing. The Company's policy also required that, prior to submitting the sample, Rando sign a consent form in which he certified that the specimen he was about to provide was not adulterated or altered in any way. The signed consent form acknowl-

edged Rando's understanding that the results of the test or his lack of cooperation in providing the specimen "[would] be used to make decisions regarding [his] future access to nuclear facilities." Consent Form, Joint Appendix at 34.

The sample that Rando provided on February 4 was detected by technicians to smell of chlorine, and subsequent tests and laboratory analysis confirmed the presence of sodium hydrochloride (a chloride compound) in the specimen. See O & D at 4. Rando was contacted at home and advised that he would be required to provide a second sample as soon as possible. On February 5, Rando submitted a second urine sample, this time under observation as required by the consent form which accompanied his first sample. The second sample submitted by Rando tested positive for cocaine. See id.

On the same day, a meeting was convened; attending were Robert LaDue, Niagara Mohawk's then General Supervisor of Labor Relations for the Nuclear Division; Mike Kenific, Rando's union representative; and Rando. At this meeting, Rando admitted that he had altered his initial drug test with chlorine but stated that he did not use drugs or illegal substances. When asked why he had adulterated the test, Rando responded that he did it to "test the system." O & D at 5. A subsequent search of Mr. Rando's locker by security personnel revealed the existence of a ten ounce bottle of chlorine solution, a small vial of urine, and another small vial of a chlorine solution. The Company claims that the results of the search were significant because they demonstrated that "[the] act on [Rando's] part to alter his drug test was planned well in advance, premeditated." O & D at 5. According to Rando, he obtained the chlorine on the morning of the test.

A disciplinary meeting was held on February 8, 1993 pursuant to Article XVI of the collective bargaining agreement.[1] At this meeting, Rando admitted that he had a substance abuse problem and that he had

---

1. Article XVI of the parties' collective bargaining agreement requires that a fact-reviewing meeting be convened prior to the imposition of any discipline involving the loss of pay. The parties in

attendance at this meeting are the accused employee and representatives from both management and the union.

altered the first sample in an attempt to conceal this problem. He and the Union requested leniency from the Company regarding the imposition of a disciplinary penalty. Rando's union representative noted that the Company had found no fault with Rando's job performance, despite conducting a full audit of his work records. The union representative further noted that Rando had no prior disciplinary infractions and had once been selected as safety employee of the month. The Company, however, represented by LaDue, decided to terminate Rando that day "on the basis of his intentional behavior to defraud the company as far as his drug test was concerned and his falsification of the document when he certified that it was not altered in any way." O & D at 5.

The Union appealed the termination through the Step Three grievance hearing procedure specified in the collective bargaining agreement. Rando's union representative argued that Rando had voluntarily begun treatment for chemical abuse following his discharge and that he deserved credit for taking that step. More significantly, Rando's union representative cited Section 3.2.3 of the Nuclear Division Directive, a Company-issued document governing nuclear employees, which provides that "[a]lteration or interference with the proper collection of samples or conduct of tests shall be treated as a positive test and shall result in the appropriate management sanctions." Rando's union representative noted that pursuant to the Company's own Fitness for Duty Program, an initial positive test subjected an employee to a two week suspension. See O & D at 6. Representing the Company at the Step Three grievance hearing, LaDue responded that the termination had nothing to do with a positive drug test, but rather was appropriate because Rando had proved himself untrustwor-

thy by falsifying a document and altering his sample. See id. Citing NRC regulations,[2] LaDue stated: "[They] require, if someone is untrustworthy and unreliable, he can't have unescorted access to the site." Id. LaDue admitted that a first positive test had never resulted in more than a two-week suspension, combined with referral to the Employee Assistance Program ("EAP"). See id.

The matter was ultimately submitted to arbitration as required by the collective bargaining agreement. See Article XXII, Joint Appendix at 72. The parties stipulated that the issue to be decided by the arbitration panel ("Panel") was: "Did the Company have just cause for the discharge of the Grievant, Patrick Rando? If not, what shall the remedy be?"[3] O & D at 1. On July 23, 1995, the Panel issued its "Opinion and Decision."[4] The Panel found that Rando had been discharged without just cause and ordered that he be reinstated to his former position "contingent on his producing a negative drug test and satisfying any requirements that may be imposed by the Employee Assistance Program after an evaluation." O & D at 14. The award also provided that, pursuant to the Fitness for Duty Program, Rando would be subject to follow-up testing at the Company's discretion for eighteen months, and that the Company could require that Rando provide urine samples under observation. See id. The Panel further ordered that if Rando met the terms for reinstatement, he was to receive back pay for the period from the date of his discharge to the date of his reinstatement, less eighteen months. See id. At this point, almost thirty months had passed since Rando's discharge.

The Company refused to reinstate Rando, and the Union brought this action in the United States District Court for the Northern District of New York seeking confirma-

**2.** LaDue was apparently referring to 10 C.F.R. §§ 26.10, 73.56. See note 15, infra.

**3.** Article XXII, section 5 of the parties' collective bargaining agreement states that if it is determined through the grievance procedure that an employee's discharge was wrongful and without just cause, the remedy shall be reinstatement with full compensation at the basic rate for all time lost or as may be appropriate under Paragraph 2 of the same section. Paragraph 2 states

that monetary benefits accruing to employees as a result of the settlement of a grievance shall be payable during the period in which the grievance is processed, subject to certain maximum time periods.

**4.** The Opinion and Decision was authored by the neutral arbitrator. The Company-appointed arbitrator dissented.

tion of the award pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The Company counterclaimed to vacate the award on the ground that its enforcement would violate public policy. The Union moved for summary judgment to confirm the award, dismiss the Company's counterclaim, and further sought an award of attorney's fees and costs. The Company cross-moved for summary judgment to vacate the award, dismiss the complaint in its entirety, and also sought an award of costs and fees.

The district court granted the Company's cross-motion for summary judgment and vacated the award, holding that Rando's reinstatement would contravene public policy. *See International Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.,* 950 F.Supp. 1227, 1236 (N.D.N.Y.1996). The district court further denied both parties' motions for attorney's fees. *See id.* The Union appeals from that portion of the district court's December 30, 1996 judgment denying the Union's motion for summary judgment and granting the Company's cross-motion for summary judgment vacating the award.

### The "Opinion and Decision" of the Arbitration Panel

The opinion of the arbitration panel begins with a review of the relevant provisions of the collective bargaining agreement, the applicable NRC regulations, and the Company's Fitness for Duty Program. Next follow the details of Rando's discharge, a summary of the parties' respective contentions, and finally, a discussion of the majority's rationale for its determination that Patrick Rando was terminated without cause.

In analyzing the propriety of the Company's disciplinary response to Rando's behavior, the Panel examined at length the Company's response within the context of both the NRC regulations and the programs enacted by the Company in compliance with these regulations. Under the NRC's Fitness for Duty regulations, the sanction to be applied when an employee first tests positive for drug use (a "first positive") is left to the discretion of the employer, but must involve at minimum a two-week denial of unescorted access to protected areas and referral to an employee assistance program. *See* 10 C.F.R. § 26.27. No sanction is specified for adulteration in the NRC regulations.

In 1987, in accordance with NRC regulations, the Company unilaterally implemented an Alcohol/Drug Screening/Testing–Fitness for Duty Program that applied to both represented and non-represented employees. In November, 1988, the Company and the Union reached agreement on an "Alcohol/Drug Testing–Fitness for Duty Program" ("Joint Program") which superceded the Company's unilaterally-imposed program. The Joint Program applies to all represented employees, including those in nuclear operations. In the Joint Program, the parties agreed upon a testing protocol, penalties for offenders, and opportunities for employees to seek help for substance abuse. *See* O & D at 3. The Joint Program specifies that the penalty for a first positive test result is a suspension of up to two weeks, and that following such suspension, an employee must take a repeat drug test, yield a negative result, and must sign an authorization permitting the Company to conduct unscheduled alcohol/drug tests for a period of eighteen months after his return to work.[5] Although the Joint Pro-

---

5. Section V of the Company's Joint Alcohol/Drug Testing-Fitness for Duty Program provides:

C. *Test Results and Discipline:* ... Employees whose test results are confirmed as positive ... may present any medical explanation as to why the test results should not be used as a basis for corrective or disciplinary action. If the Company doctor or medical representative is satisfied with such explanation, the employee will be restored to duty without loss of pay. If not, an Article XVI meeting will be convened as soon as possible. Unless the facts presented at the Article XVI meeting dictate otherwise, the employee in question will be suspended up to two weeks without pay and will be returned to work only in accordance with the provisions of paragraph D below.

D. *Rehabilitation and Retesting:* In addition to any discipline which is imposed at the Article XVI meeting, an employee who is tested positive will have available to him the services of the [EAP] and may be referred for evaluation to the [EAP] Coordinator or competent medical authority. At the conclusion of rehabilitation and/or discipline, the employee will be returned to work provided he (a) tests negative, (b) gives the Company acceptable assurance that he is following any rehabilitation program that has been duly prescribed, and (c)

gram does not address the penalty for adulteration,[6] an additional, Company-issued document, referred to as the Nuclear Division Directive, specifies that adulteration of a drug test is to be treated as a positive test.[7]

In determining whether the just cause standard specified in Article XXII of the collective bargaining agreement was met when the Company discharged Rando for adulterating his drug test, the Panel stated that just cause requires notice of the potential consequences of misconduct prior to the imposition of discipline. *See* O & D at 9. The Panel found that Rando was discharged without cause principally because he had not received sufficient notice of discharge as a potential disciplinary penalty for the offense of adulteration. *See id.* at 9–14. The majority found "[t]he notion that an employee could be subject to a disciplinary penalty that was never announced [to be] alien to the concept of due process." *Id.* at 9. The Panel described "[p]roper notice [as] the first of the canonical 'seven tests' of just cause." *Id.* (citing *Grief Brothers*, 42 LA 555 (Daugher-

ty, 1964)).[8] Furthermore, the Panel observed, in order to satisfy the just cause standard, such notice must be "full and unmistakable." O & D at 9.

The Panel concluded that Patrick Rando had not received adequate notice that the disciplinary consequences attendant to adulterating a urine sample included termination. In so finding, the Panel rejected the Company's contention that the act of adulterating the sample was tantamount to falsification of documents, an offense which the Company claimed "intrinsically warrants discharge," and the punishment for which the Company asserted was within management's sole authority and of which employees were aware. *See id.* at 9. In support of this argument, the Company noted that annual training sessions for nuclear employees emphasized that falsification of documents, such as work records, would lead to discharge. However, the Panel found no evidence that the training explicitly equated adulteration of drug tests with falsification of documents, stating that "[t]he link is by no means self-evident." *Id.* The Panel

---

signs an authorization permitting the Company to conduct unscheduled alcohol/drug tests of said employee for a period of eighteen (18) months after his return to work. An employee released from a rehabilitation program who still tests positive, will be granted up to an additional fifteen (15) work days, Code 60, to produce a negative test result. Based on this negative test and meeting the provisions outlined above the employee will be returned to work. After this period if the employee still tests positive he will be subject to termination after an Article XVI meeting.

6. While, as noted, the Joint Program does not specifically mention adulteration, Section IV, "Forms, Submission to Testing Requirements and Discipline," does impose a sanction for an employee's refusal to sign the consent form or submit a specimen:

B. *Refusal to Sign Forms and/or Be Tested:* Any employee who refuses to complete and sign the required forms or to provide a specimen for testing will immediately become subject to the disciplinary procedure of Article XVI of the parties' labor agreement. Absent mitigating circumstances, the employee will be suspended for up to two weeks without pay. If the employee contacts his supervisor during or at the end of the suspension, and agrees to sign the required forms, and is tested, with negative results, and authorizes the Company to retest him at its discretion for 18 months after his return to work, such employee will then be

allowed to return to work and his pay will be resumed at that time. Employees who refuse to comply with these requirements will be subject to termination after an Article XVI meeting.

7. The Nuclear Division Directive, which took effect October 15, 1992, provides in part:

3.2.2 Refusal to submit to the drug and alcohol tests required by this directive shall be treated as a positive test and shall result in the appropriate management sanctions. 10 C.F.R. 26.27(c).
3.2.3 Alteration or interference with the proper collection of samples or conduct of tests shall be treated as a positive test and shall result in appropriate management sanctions.

8. As the district court noted, several factors are to be considered by arbitrators when determining whether just cause for termination exists. These include, but are not limited to the following: (1) whether the employee was afforded due process and could be expected to know his conduct would subject him to discipline; (2) whether the employer's actions were non-discriminatory; and (3) whether the penalty is reasonably related to the seriousness of the offense and/or the employee's record with the employer. 950 F.Supp. at 1230 (citing F. Elkouri & E.A. Elkouri, *How Arbitration Works*, 670–86 (4th ed.1985)). The weight given to these factors varies with the individual case.

concluded that Rando's act of adulterating the urine sample constituted an insubordinate refusal to submit a specimen as required by the Joint Fitness Program rather than falsification of a work record. *See* O & D at 9–14.

Furthermore, the Panel found that nothing in the language of the consent form that accompanies a submitted urine sample places an employee on notice that discharge is a potential consequence of adulterating a sample. Moreover, according to the Panel, the language of the consent form is inconsistent with the Company's argument that this offense constitutes falsification of work records meriting dismissal. To the contrary, the Panel noted that the consent form signed by Rando merely put an employee on notice that tampering with the sample may lead to the employee being required to produce a second sample, perhaps conducted under observation.[9] The Panel observed: "It is paradoxical to call for a retest in cases of adulteration and at the same time deem that conduct a summarily dischargeable offense (falsification)." O & D at 9. Also, according to the Panel, the consent form could not be compared to a falsified work record because when Rando signed the form, he had not yet submitted the urine sample, and thus, no work record was yet in existence. *Id.* at 10. Rather, the Panel observed, the offense actually occurred later when, in submitting an adulterated sample, Rando "failed to comply with the undertaking he gave on the form—a failing akin to insubordination." *Id.*

The Panel also found evidence in the Company's history which suggested that the Company had at one time considered adulteration to be a matter of insubordination, rather than one necessarily related to integrity. While the 1988 Joint Fitness Program did not address the issue of adulteration at all, under the Company's prior, unilaterally-imposed Fitness for Duty Program, a "Company Drug Testing Information and Instruction Sheet" had been issued to all employees which cautioned, among other things, that "[a]ny adulteration or switching of urine by an employee will be considered insubordination and will result in disciplinary action up to and including discharge." O & D at 15. The Panel considered the omission of a similar provision in the Joint Program to be significant. *See* O & D at 9. Furthermore, the Panel took note of the Company's unilaterally-enacted Nuclear Division Directive, effective October 15, 1992, which states with respect to adulteration only that "[a]lteration or interference with the proper collection of samples or conduct of tests shall be treated as a positive test and shall result in appropriate management sanctions." Nuclear Division Directive, § 3.2.3, Joint Appendix at 31. Given the Company's prior view of adulteration as synonymous with insubordination, and in light of the lack of direct notice to employees of an intention to treat this conduct as a dischargeable offense, the Panel rejected the Company's efforts to re-characterize the offense as falsification warranting summary dismissal.[10] *See* O & D at 10.

In characterizing Rando's adulteration of the sample as insubordination as opposed to falsification, the Panel also found the past practice of the Company in addressing similar occurrences to be highly instructive. During the Step Three grievance hearing, LaDue admitted: "I'm not aware of someone being terminated for a first time drug, or alcohol, when they tested positive." O & D at 6. The Panel found that the record contained no example of an employee discharged for adulteration since the Joint Program was adopted in 1988. The parties' history did reveal one other case in which an employee was found to have adulterated a urine sample in connection with a drug test, but the em-

---

9. The relevant language of the consent form signed by Rando stated: "I understand an observed sample may be necessary if there is reason to believe a specimen may be or has been altered or substituted." O & D at 20.

10. The Panel also rejected the Company's analogy to the "Rounds Case," an incident involving the discharge of seven employees for falsification, five of whom were ordered reinstated by the arbitrator in that case. The Panel distinguished the Rounds Case, noting that "the grievants [in that case] were charged with systematic patterns of misrepresentation, affecting key work records, over a considerable period. Mr. Rando's isolated act cannot be likened to a sustained and concerted effort to evade operational safety procedures." O & D at 13.

ployee had received only a three-week suspension. In that incident, which occurred in 1992, Doe, a gas division employee, tested positive for cocaine. Doe's discipline consisted of a two week suspension for testing positive, a requirement that he continue his rehabilitation with the Company's Employee Assistance Program and follow up on all prescribed courses of treatment, the possibility of spot drug screening for an eighteen month period, and the further penalty of an additional week of suspension for tampering with his urine specimen. Doe's decision to tamper with his urine sample was viewed by the Company as a refusal to be drug tested, an act which the Company claimed subjected him to further discipline under the Company's Fitness for Duty Program.[11] See O & D at 12.

The Panel found the Doe case to be relevant to the issue of Rando's discharge:

> In the Doe case adulteration was treated as a refusal to be tested, that is, as a form of insubordination, rather than a form of falsification. Doe was not a nuclear employee, ... but the difference between gas and nuclear cannot mutate the essential nature of the offense, transforming insubordination into falsification.

O & D at 13. The Company argued that one case did not establish a binding practice and that Doe was given a "break" by management. See id. The Panel rejected this argument, stating that "the company's characterization of [Doe's] offense cannot be ignored." Id. In short, there was no indication that the Company had ever treated Rando's conduct, or any conduct close to it, as a cause for immediate termination.

The Panel also found significant the fact that the Company's Nuclear Division Directive, which conformed Company policy to the NRC regulations, did not treat adulteration as a disqualifying character offense. Rather, the Directive "brackets adulteration with 'interference' and orders that the adulterator be treated as if he tested positive.

Access is denied to those who are positive but, for a first positive, only briefly." O & D at 10. The Panel observed that if adulteration were considered to be a form of fraud, the privilege of access certainly could not be re-conferred after such a brief hiatus. The Panel also noted that other offenses resulted in withdrawal of access for considerably longer periods of time, such as possession or use of drugs or alcohol within protected areas, which carries with it a denial of access privileges for five years. See Nuclear Division Directive. § 3.3.1 (citing 10 C.F.R. 26.27(b)(3)). "In the scheme propounded by the directive, then, adulteration does not rank among the most serious offenses." O & D at 10. The Panel determined that because the right of unescorted access significantly impacts safety in the nuclear industry, the response established by the Directive could be taken as an index of the gravity of the offense of adulteration. See id. The Panel noted:

> A person who was considered deficient in character would not be granted access to a regulated facility. The company cannot plausibly claim that an offense renders an employee inherently lacking in trust when the watchdog agency has no qualms about his returning to the facility. It is thus manifestly reasonable to take into account the extent of access denial in determining the justice of the discipline imposed on the grievant. It would be incongruous if adulteration merited only brief loss of access and at the same time automatic discharge.

O & D at 10–11.

In concluding, the Panel acknowledged:

> There can be no doubt that adulteration is contrary to the Joint Program, which afforded an employee an authorized way to avoid taking the test: he would have to accept two weeks off for refusal. The grievant decided to avoid taking the test in an unauthorized way—by rendering the urine useless. His conduct clearly invites a proportionate penalty of some kind, even

---

11. After Doe's follow-up testing proved positive, he was suspended indefinitely, with future reinstatement made expressly contingent on Doe's enrollment, participation and successful completion of all treatment and therapy as prescribed by the Company's EAP and Doe's primary counselor. The Company advised Doe that failure to satisfy these conditions would result in his termination. See O & D at 12–13.

though it does not justify discarding him as an unemployable moral reprobate.

O & D at 13. The Panel thus ordered that Rando be reinstated to his former position, contingent on his producing a negative drug test and satisfying any requirements that might be imposed under the Employee Assistance Program after an evaluation. The Panel further ordered that if Rando met the requirements for reinstatement, he was to receive back pay for the period from the date of his discharge to the date of his reinstatement, less eighteen months,[12] with any earnings during the eighteen month period to be deducted from the back pay. Rando was also deemed subject to follow-up testing at the Company's discretion for eighteen months following his reinstatement, and the Company was permitted to require that samples be produced under observation. *See* O & D at 14.

### The District Court Opinion

After examining the facts surrounding Patrick Rando's discharge, the district court analyzed the proper role for a court when it is asked to review an arbitrator's decision. The district court articulated the well-accepted proposition that courts are not authorized to reconsider the merits of an arbitration award, recognizing that the strong "federal policy of settling labor disputes by arbitration" would be undermined by a contrary position. *International Bhd. of Electrical Workers, Local 97 v. Niagara Mohawk Power Corp.*, 950 F.Supp. 1227, 1231 (N.D.N.Y.1996)(citing *Newsday, Inc. v. Long Island Typographical Union*, 915 F.2d 840, 844 (2d Cir.1990)). Citing precedent of this Court expressing the deference to be accorded the decision of an arbitrator, the district

court observed that an award will not be vacated " 'even if the arbitrator's interpretation of the contract is clearly erroneous, so long as such Award is explained in terms that offer even a barely colorable justification for the outcome reached.' " 950 F.Supp. at 1231 (quoting *Hygrade Operators, Inc. v. Local 333, ILA*, 945 F.2d 18, 22 (2d Cir. 1991)). The district court went on to note that the Second Circuit's position is entirely consistent with the standard expressed in *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987), where the Supreme Court stated that "[a]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."

The district court then considered an exception to this general rule: "a court may, however, refuse to enforce an [arbitration] award pursuant to a collective bargaining agreement if the award is contrary to public policy." 950 F.Supp. at 1231 (citing *Misco*, 484 U.S. at 42–43, 108 S.Ct. at 372–74; *Newsday*, 915 F.2d at 844). After citing a number of cases in which courts have vacated arbitrators' awards that were held to violate public policy, the district court proceeded to articulate the public policy implicated by the present case. *See* 950 F.Supp. at 1232. The court stated that "federal statutes, regulations, and case law support a finding of a well-defined and dominant public policy against employment of individuals who deliberately violate nuclear safety rules and cannot meet NRC standards of trustworthiness and reliability." *Id.* at 1234.

12. The Union's proposed outcome was that Rando's conduct be treated merely as a "first drug offense," an offense punishable only by a two-week suspension. The Panel rejected this recommendation, pointing out that the Union's proposal would leave Rando no worse off than an employee who lost two weeks of pay by refusing to be drug tested in the traditional way. The Panel stated: "Taking responsibility is a key tenet of substance abuse treatment, and an employee with a disease characterized by denial benefits from being held accountable for taking the wrong path." O & D at 13–14. The Panel thus concluded that "although the [Company] lacked

just cause to discharge [Rando] ... there would have been just cause for a disciplinary penalty beyond that specified in the Joint Program, on the ground that frustrating the test through adulteration is a form of insubordinate conduct...." The Panel further found that the back pay that would normally attach to a reinstatement for unjust discharge was not proper in Rando's case, as the fact that he tested positive for drugs and entered a treatment program for approximately one year indicated that "his actual fitness for duty in the period immediately following the discharge is uncertain." O & D at 14.

The district court also declared that because of the strong public policy issues involved in this case, it intended to "review the findings of the arbitration panel de novo." *Id.* In describing the level of deference that a reviewing court must give the factual findings underlying an arbitrator's award, the district court stated that "[a]lthough reviewing courts must ordinarily accept an arbitrator's findings of fact, in addressing public policy concerns, the courts are not to defer to the arbitrator, but rather consider these issues de novo." *Id.* at 1232. The district court sought support for this proposition from *Misco,* in which the Supreme Court stated that " 'the question of public policy is ultimately one for resolution by the courts.' " *Id.* (quoting *Misco,* 484 U.S. at 43, 108 S.Ct. at 373).

Having determined that it had the authority to conduct a *de novo* review, the district court rejected a number of findings critical to the Panel's determination that Patrick Rando had not been afforded due process because he was not on notice that his conduct could result in termination. Instead, the court concluded that "[a] reasonable person in the grievant's employment position would be on notice that violating the federally mandated drug policy set forth by Niagara Mohawk, adulterating a urine sample, falsifying a certification that he would not adulterate his urine sample, and falsely denying illegal drug use could result in termination." 950 F.Supp. at 1236.

Thus, after reviewing the same facts that had been considered by the Panel, the district court concluded first, that Rando's conduct "supports a finding that he is neither trustworthy or reliable as required by the NRC regulatory scheme implemented by Niagara Mohawk[,]" and second, that his actions are "substantial evidence that [he] can no longer be considered trustworthy or reliable, at least to the degree required to hold the position of chemistry technician at a nuclear power plant." *Id.* The district court thus concluded that the reinstatement of Patrick Rando "would contravene public policy requiring strict adherence to nuclear safety rules." *Id.*

**Discussion**

We first address the law concerning judicial review of arbitration awards generally and under the public policy exception, before discussing whether the district court's vacatur was appropriate under the circumstances of this case.

(1)

It is well-settled that courts play a limited role when asked to review the decision of an arbitrator made pursuant to a grant of authority to interpret a collective bargaining agreement. Courts are not empowered to reexamine the merits of an arbitration award, even though the parties to the agreement may argue that the award arises out of a misinterpretation of the contract or a factual error. *See United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 369–70, 98 L.Ed.2d 286 (1987). As the Supreme Court stated almost forty years ago, "[t]he refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960). Thus, an arbitrator's award is legitimate and enforceable as long as it "draws its essence from the collective bargaining agreement" and is not merely an exercise of the arbitrator's "own brand of industrial justice." *Id.* at 597, 80 S.Ct. at 1361.

The reasons for according such deference to arbitral decisions by insulating them from judicial review can be traced to the federal statutes which regulate labor-management relations. *See Misco,* 484 U.S. at 37, 108 S.Ct. at 370. The Labor–Management Relations Act of 1947 reflects a clear preference for the private resolution of labor disputes without government intervention: " '[F]inal adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bar-

gaining agreement.'" *Id.* (quoting 61 Stat. 154, 29 U.S.C. § 173(d)). In accordance with this deferential approach, the Supreme Court has unambiguously stated that a reviewing court is bound by both the arbitrator's factual findings and his judgment regarding remedies. *See Misco,* 484 U.S. at 37–38, 108 S.Ct. at 370–71. It is abundantly clear that courts must tread lightly when reviewing arbitral decisions. That a court believes an arbitrator to have committed serious legal or factual error will not justify overturning his decision, provided that the arbitrator is "even arguably construing or applying the contract and acting within the scope of his authority." *Id.* at 38, 108 S.Ct. at 371; *see also Wackenhut Corp. v. Amalgamated Local 515 and Int'l Union,* 126 F.3d 29, 32 (2d Cir.1997)("The contractual theory of arbitration ... requires a reviewing court to affirm an award it views as incorrect—even very incorrect—so long as the decision is plausibly grounded in the parties' agreement."); *Saint Mary Home, Inc. v. Service Employees Int'l Union, Dist. 1199,* 116 F.3d 41 (2d Cir.1997); *Denver & Rio Grande Western R.R. Co. v. Union Pac. R.R. Co.,* 119 F.3d 847, 849 (10th Cir.1997)("Errors in either the arbitrator's factual findings or his interpretation of the law (unless that interpretation shows a manifest disregard of controlling law) do not justify review or reversal on the merits of the controversy.")(citing *Misco,* 484 U.S. at 36–38, 108 S.Ct. at 369–71).

Against this background, we now examine a narrow exception to the deferential approach that generally characterizes judicial review of arbitration awards. In *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983), the Supreme Court held that "a court may not enforce a collective-bargaining agreement that is contrary to public policy" and that "the question of public policy is ultimately one for resolution by the courts." The Court stated that "[i]f the contract as interpreted by [the arbitrator] violates some explicit public policy, we are obliged to refrain from enforcing it." *Id.* However, in *W.R. Grace,* the Court concluded that enforcement of the arbitration award at issue there did not compromise the public policy requiring obedience to court orders. In *W.R. Grace,* a damages award granted to employees for breach of seniority provisions under a collective bargaining agreement was held not to violate public policy, even though a court-ordered conciliation agreement signed by the employer conflicted with the seniority provisions of the collective bargaining agreement. *See id.* at 768–70, 103 S.Ct. at 2184–86. Emphasizing the limited nature of the public policy exception, the Supreme Court stated that a court's refusal to enforce an arbitrator's interpretation of a collective bargaining agreement is limited to situations where the contract as interpreted would violate "some explicit public policy" that is "well defined and dominant." *Id.* at 766, 103 S.Ct. at 2183–84 (citing *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).

Four years later, in factual circumstances closer to those raised by this case, the Supreme Court again discussed the public policy exception, stating once more that "[a] court[ ] [may refuse] to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 42, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987). Nonetheless, the Court cautioned that its decision in *W.R. Grace* "does not ... sanction a broad judicial power to set aside arbitration awards as against public policy." *Id.* at 43, 108 S.Ct. at 373–74. Rather, the Court stressed the limited parameters within which a court must operate when reviewing an arbitral award for possible violation of public policy:

> Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. *Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.* To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the

arbitrator's interpretation of the contract.... So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect. If the courts were free to intervene on these grounds, the speedy resolution of grievances by private mechanisms would be greatly undermined.

*Misco,* 484 U.S. at 37–38, 108 S.Ct. at 370–71 (emphasis added). Thus, in *Misco,* in a unanimous ruling that reversed a Fifth Circuit decision setting aside an arbitration award which ordered the reinstatement of an employee who had been suspended for suspected possession and use of marijuana on company property, the *Misco* Court emphasized that the decision in *W.R. Grace* "turned on our examination of whether the award created any explicit conflict with other laws and legal precedents." *Id.* at 43, 108 S.Ct. at 373 (internal quotations omitted).

It is evident that in referring to the "award," the *Misco* Court was focusing on the final result of the arbitrator's remedy, namely, whether the reinstatement itself "would actually violate" the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." *Id.* at 44, 108 S.Ct. at 374 (internal quotations omitted). At no point did the Court evaluate or question the reasoning which led the arbitrator to fashion the remedy of reinstatement. Rather, the Court criticized the Fifth Circuit both for its reasoning on the merits, and for substituting its own judgment for that of the arbitrator. The Court expressed a clear intent to insulate the arbitrator's fact-finding and reasoning from judicial scrutiny, stating that

[I]t was inappropriate for the Court of Appeals itself to draw the necessary inference ... [that the employee] had ever been or would be under the influence of marijuana while he was on the job.... [T]he fact that it is inquiring into a possible violation of public policy [does not] excuse a court for doing the arbitrator's task.

*Id.* at 44–45, 108 S.Ct. at 374–75.

The Supreme Court's emphasis on result, as opposed to the arbitrator's reasoning, is consistent with the deference that must be accorded the arbitrator's role in resolving disputes arising under collective bargaining agreements, while at the same time providing the courts with a necessary check on the compatibility of the chosen remedy with public policy. *See id.* at 44, 108 S.Ct. at 374 ("A refusal to enforce an award must rest on more than speculation or assumption."); *see also Saint Mary,* 116 F.3d at 46 ("[C]ourts may refuse to enforce arbitral awards only in those rare cases when enforcement of the award would be directly at odds with a well defined and dominant public policy resting on clear law and legal precedent."); *Stead Motors v. Automotive Machinists Lodge No. 1173,* 886 F.2d 1200, 1212–13 (9th Cir. 1989)(en banc)("[A] faithful reading of *Misco* requires ... [that a] court must both delineate an overriding public policy rooted in something more than 'general considerations of supposed public interests,' and, of equal significance, it *must demonstrate that the policy is one that specifically militates against the relief ordered by the arbitrator.*")(quoting *Misco,* 484 U.S. at 44, 108 S.Ct. at 374)(emphasis added).

We, therefore, read the Supreme Court's decision in *Misco* to mean that a court's task in reviewing an arbitral award for possible violations of public policy is limited to determining whether the award itself, as contrasted with the reasoning that underlies the award, "create[s][an] explicit conflict with other laws and legal precedents" and thus clearly violates an identifiable public policy. *Misco,* 484 U.S. at 43, 108 S.Ct. at 373–74 (internal quotations omitted). A court is not authorized to revisit or question the fact-finding or the reasoning which produced the award. Moreover, this approach is compatible with the well-recognized principle that arbitrators are not required to provide reasons for their awards. *See Enterprise Wheel,* 363 U.S. at 598, 80 S.Ct. at 1361–62 ("A mere ambiguity in the opinion accompanying an award ... is not a reason for refusing to enforce the award. Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to

play it safe by writing no supporting opinions.")(footnote omitted).

The Second Circuit's recent articulation of the public policy exception fully comports with the result-oriented approach which in our view should govern a federal court's review of an arbitration award on public policy grounds. In *Saint Mary Home, Inc. v. Service Int'l Union, Dist. 1199*, 116 F.3d 41 (2d Cir.1997), this Court upheld an arbitration award which ordered reinstatement of a nursing facility employee who had been discharged for possession of marijuana with intent to sell while on the job. This Court's opinion began by reiterating the basic premise that a court "may not substitute its view for that of the arbitrator nor may it even review the award for clear error." *Id.* at 44 (citing *Leed Architectural Prods., Inc. v. United Steelworkers, Local 6674,* 916 F.2d 63, 65 (2d Cir.1990)). It further stated that where an arbitrator explains his conclusions "in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." *Saint Mary Home*, 116 F.3d at 44 (quoting *Andros Compania Maritima, S.A. and Marc Rich & Co., A.G.*, 579 F.2d 691, 704 (2d Cir.1978)). Thus, *Saint Mary Home* rejected the argument that public policy categorically prohibits reinstatement in all cases where drug related conduct occurs in the workplace, finding instead that "the public policy relating to the response for drug related conduct in the workplace is flexible and remedial." 116 F.3d at 46. The opinion also noted the absence of an established and dominant public policy, as demonstrated through case law or regulations, "prohibiting reinstatement after suspension of those convicted of drug offenses in the health care industry, one of the most heavily regulated industries in the country." *Id.* at 47. And while the opinion in dicta stated that the case before the court was to be contrasted with cases from other courts in which arbitral awards calling for reinstatement of employees to various safety-sensitive positions were vacated, (citing *Union Pac. R.R. v. United Transp. Union*, 3 F.3d 255 (8th Cir.1993)(railroad); *Exxon Shipping Co. v. Exxon Seamen's Union*, 993

F.2d 357 (3d Cir.1993)(shipping); *Gulf Coast Indus. Workers Union v. Exxon Co.*, 991 F.2d 244 (5th Cir.1993)(petro-chemical refinery); *Georgia Power Co. v. International Bhd. of Elec. Workers, Local 84*, 707 F.Supp. 531 (N.D.Ga.1989), *aff'd* 896 F.2d 507 (11th Cir.1990)(utility plant); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665 (11th Cir.1988) (airline); *Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers*, 834 F.2d 1424 (8th Cir.1987)(nuclear power plant)) the opinion, nonetheless, confirms that an appropriate analysis of the public policy question requires that a court focus on the outcome of the arbitrator's interpretation of the contract—namely, whether the remedy imposed can be fairly and unequivocally shown to violate a well-established public policy. *See Saint Mary Home*, 116 F.3d at 46–47.

Our reading of Supreme Court jurisprudence, as well as the most recent words of this Court, indicates that the approach does not change when the case involves the reinstatement of an employee to a safety-sensitive position in the nuclear power industry, as does the case immediately before us. In determining whether an arbitral award which orders reinstatement of an employee previously discharged from a nuclear power plant violates public policy, the issue should be whether the reinstatement itself specifically contravenes a "well defined and dominant public policy." *Misco*, 484 U.S. at 44, 108 S.Ct. at 374. As we have already demonstrated, such an analytical framework is the only one which can adequately reconcile the competing interests at stake here; namely, the deference that must be accorded an arbitrator's judgment, on the one hand, and the substantial public interest in nuclear safety, on the other.

(2)

Having identified the proper framework which a district court should employ when reviewing an arbitral award for possible violation of public policy, we must now determine whether the conditional reinstatement of an employee to a highly safety-sensitive position in a nuclear power plant necessarily violates public policy, where that

employee adulterated a drug test, subsequently tested positive for drugs, and denied having a substance abuse problem when initially confronted with the test results.

There can be no doubt, nor does the Union dispute, that there exists a strong public policy in favor of promoting a safe, drug-free working environment in the nuclear power industry. We agree with the district court that the existence of extensive federal legislation governing safety in the nuclear power context, as well as Congressional authorization for a specific agency, the Nuclear Regulatory Commission, to oversee and ensure nuclear safety, reflects "the level of public concern over the safety of the nuclear power industry." *International Bhd. Of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.,* 950 F.Supp. 1227, 1232 (N.D.N.Y.1996). Observing that the NRC regulations represent "a strict regulatory scheme devised by Congress for the protection of the public from the hazards of nuclear radiation[,]" the district court correctly concluded that "[t]here is a dominant and well-defined policy 'requiring strict adherence to nuclear safety rules.' " *Id.* (quoting *Iowa Elec. Light & Power Co. v. Local Union 204, IBEW,* 834 F.2d 1424, 1427–28 (8th Cir. 1987)). *See also Daniel Constr. Co. v. Local 257, IBEW,* 856 F.2d 1174, 1182 (8th Cir. 1988).

The question before us is thus whether the award ordering the conditional reinstatement of Patrick Rando necessarily violates public policy concerning nuclear safety. We find that it does not. A close analysis of the Nuclear Regulatory Commission regulations, arguably the most persuasive evidence of the public policy at issue in this case, indicates that these regulations do not proscribe the reinstatement of employees previously found to have adulterated a drug test or who have tested positive for drugs or alcohol. First, given the comprehensiveness of the regulations, it is significant that they do not discuss adulteration, let alone specify any penalty or sanction for adulterating a drug test. Second, the NRC regulations require only a relatively minimal response when nuclear power plant operators learn that an employee has failed a drug test for the first time.

Specifically, 10 C.F.R. § 26.27 requires licensees (*i.e.,* operators of nuclear power plants subject to NRC regulations) to "take the following actions ... [A first positive] must, as a minimum, result in immediate removal from activities [within the facility] for at least 14 days and referral to the EAP for assessment and counseling during any suspension period." 10 C.F.R. § 26.27(b)(2).

The lack of any mention of adulteration and the fact that the NRC regulations specify only a two-week minimum sanction for a first positive test result is powerful evidence that the regulations themselves do not contemplate dismissal as the ordinary penalty for an initial drug offense. To the contrary, § 26.27 clearly contemplates the notion of both rehabilitation and reinstatement:

> Plans for treatment, follow-up, and future employment must be developed, and any rehabilitation program deemed appropriate must be initiated during such suspension period. Satisfactory management and medical assurance of the individual's fitness to adequately perform activities within the scope of this part must be obtained before permitting the individual to be returned to these activities.

10 C.F.R. § 26.27(b)(2). Indeed, the favorable attitude of the regulations toward rehabilitation and reinstatement is illustrated by this same provision, which begins by stating that "[l]acking any other evidence to indicate the use, sale, or possession of illegal drugs onsite, a confirmed positive test result must be presumed to be an indication of offsite drug use." *Id.* This is significant because of the sharp distinction which the regulations draw between onsite and offsite use of drugs. The former leads to a minimum five year denial of access to the plant, 10 C.F.R. § 26.27(b)(3), whereas, off-site use of drugs requires only a minimum two-week suspension. 10 C.F.R. § 26.27(b)(2). Surely, if rehabilitation was not a significant consideration, the presumption would work the other way, placing the burden on the employee to demonstrate that he or she had not used drugs onsite before being allowed to return to the premises.

It is thus evident that nothing within the NRC regulations prohibits the re-em-

ployment of an employee who yields a first positive on a drug test, provided that adequate assurance of the employee's rehabilitation is obtained. Furthermore, as the NRC regulations do not speak to the issues of either adulteration or false denials, there is no evidence that the NRC intended to deny the possibility of rehabilitation and re-employment to an employee who initially falsely denies that he has a drug problem, or to bar the eventual reinstatement of an employee found to have adulterated a drug test or to have falsely certified on a consent form that he would not adulterate the test. Moreover, the Company's own Nuclear Division Directive specifies that an incident of adulteration is to be treated as a "first positive," an offense meriting only a two week suspension under the Company's Fitness for Duty Program. *See* Nuclear Division Directive, § 3.2.3. Given the NRC's express contemplation of eventual reinstatement as a viable response to evidence of offsite drug use by an employee and its silence on the issue of adulteration, we do not see how the district court could conclude that the conditional reinstatement of Patrick Rando constitutes a clear violation of the public policy favoring a safe nuclear work environment. *See DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 825 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 695, 139 L.Ed.2d 639 (1998)("The party seeking to prevent enforcement of the award must 'clearly show[ ]' a violation of public policy.")(quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 373–74, 98 L.Ed.2d 286 (1987)); *Saint Mary Home, Inc. v. Ser-*

*vice Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 45 (1997).

The Panel here ordered that Rando be reinstated "contingent on his producing a negative drug test and satisfying any requirements that may be imposed by the Employee Assistance Program after an evaluation." O & D at 14. The award also provided for follow-up testing of Rando at the Company's discretion for an eighteen month period. *Id.* Thus, the Panel's award contains an implicit recognition that if an employee is to be reinstated to his former position, it must be in a manner consistent with NRC regulations and protective of public safety. The award fashioned by the Panel meets that test. By conditioning Rando's reinstatement on satisfactory proof of his drug-free, rehabilitated status, the Panel specifically sought to prevent a situation where nuclear safety might be compromised in the future. As such, it cannot be said that enforcement of the Panel's award providing for the conditional reinstatement of Rando "would actually violate the public policy" favoring a safe nuclear work environment. *Misco*, 484 U.S. at 44, 108 S.Ct. at 374.

(3)

The Company makes two principal arguments on appeal; first, that the public policy relating to nuclear safety includes a mandate that employees granted unescorted access to nuclear facilities be trustworthy and reliable, and second, that because Rando's actions render him untrustworthy within the meaning of these regulations, the arbitration panel's award reinstating Rando necessarily violates public policy.[13]

---

**13.** The Company also argues that the Panel's award cannot be enforced because at no point did the Panel render a finding as to whether Rando was trustworthy and reliable. The Company's argument that a specific finding of trustworthiness and reliability was required is without merit. Such a mandate would undermine the established view that unlike judges, labor arbitrators are not required make findings or to provide reasons for their awards. *See Enterprise Wheel*, 363 U.S. at 598, 80 S.Ct. at 1361–62; *Folkways Music Publ. v. Weiss*, 989 F.2d 108, 112 (2d Cir.1993); *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214–15 (2d Cir.1972). Thus here, the Panel's award may be upheld even if it did not articulate the basis for its determination that Rando was discharged in violation of the collec-

tive bargaining agreement, so long as conditional reinstatement was an appropriate remedy for this violation and does not violate public policy as that policy is interpreted by the courts.

Furthermore, it bears noting that the parties here did not request a finding by the Panel on the question of whether Rando was trustworthy and reliable. Rather, the Panel was instructed to answer only the question stipulated by the parties—whether Patrick Rando was discharged for cause, and if not, what should be the remedy. The Panel was not asked to discuss, let alone resolve, the public policy implications of reinstating Rando, although in its choice of remedy the Panel implicitly did address this issue. Assuming, however, that the Panel was required to

To support its argument, the Company points to two provisions of the NRC regulations. The first of these provisions provides that individuals granted unescorted access to protected areas within the nuclear power plant must be "trustworthy and reliable" and that they "not constitute an unreasonable risk to the health and safety of the public." 10 C.F.R. § 73.56(b)(1).[14] The Company also relies on a provision in the regulations dealing with Fitness for Duty Programs, which articulates as one of three objectives for these programs: to provide reasonable assurance that nuclear power plant personnel "will perform their tasks in a reliable and trustworthy manner." 10 C.F.R. § 26.10(a).[15] The Company argues that Rando proved himself to be dishonest and untrustworthy by "[lying] on his consent form, adulterating his urine sample in a premeditated fashion and [lying] about his actions and drug use when [initially] confronted." O & D at 7.

■ The district court, in reviewing the provisions of the NRC regulations which require that employees of nuclear power plants be trustworthy and reliable, determined that these requirements should be read into the public policy at issue in this case. This was an appropriate exercise of the court's reviewing authority, as "the question of public policy is ultimately one for resolution by the courts" and is to be ascertained "by reference to . . . laws and legal precedents." *W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber, Cork, Linoleum, & Plastic Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983). After identifying the relevant public policy, the district court then essentially concluded that any employee who acts as Rando did (*i.e.*, who adulterates a drug test, falsely certifies that he would not adulterate his urine sample, and falsely denies illegal drug use) is not trustworthy and reliable.

We would agree that Rando's actions were dishonest, but in our view, this determination does not end the discussion. Assuming that the public policy relating to nuclear safety requires in part that employees of nuclear power plants be trustworthy and reliable, the real question is whether Rando's dishonest acts render him an inherently untrustworthy person within the meaning of the NRC regulations when read as a whole. The only basis

address the issue of Rando's trustworthiness and reliability, a review of the Opinion and Decision reveals that the Panel was aware of the public policy concerns implicated by Rando's reinstatement and further, that the Panel did consider the issue of Rando's trustworthiness and reliability in the course of rendering its determination that he was discharged without just cause. *See* O & D at 7, 10–11.

14.  10 C.F.R. § 73.56 ("Personnel access authorization requirements for nuclear power plants") states:

(b) General performance objective and requirements.
(1) The licensee shall establish and maintain an access authorization program granting individuals unescorted access to protected and vital areas with the objective of providing assurance that *individuals granted unescorted access are trustworthy and reliable,* and do not constitute an unreasonable risk to the health and safety of the public including a potential to commit radiological sabotage.
(emphasis added).   Section 73.56(b)(2) further provides that unescorted access programs must include:
(i) A background investigation designed to identify past actions which are indicative of an individual's future reliability within a protected or vital area of a nuclear power reactor. . . .

(ii) A psychological assessment designed to evaluate the possible impact of any noted psychological characteristics which may have a bearing on trustworthiness and reliability.
(iii) Behavioral observation, conducted by supervisors and management personnel, designed to detect individual behavioral changes which, if left unattended, could lead to acts detrimental to the public health and safety.

15.  10 C.F.R. § 26.10 ("General performance objectives") provides:

Fitness-for-duty programs must:
(a) Provide reasonable assurance that nuclear power plant personnel, transporter personnel, and personnel of licensees authorized to possess or use formula quantities of SSNM, *will perform their tasks in a reliable and trustworthy manner* and are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties;
(b) Provide reasonable measures for the early detection of persons who are not fit to perform activities within the scope of this Part; and
(c) Have a goal of achieving a drug-free workplace and a workplace free of the effects of such substances.
(emphasis added).

on which we or the district court could overturn the Panel's award would be an unequivocal showing that Rando's actions make him untrustworthy and unreliable within the meaning of the regulations. The central question in this inquiry is, therefore, the meaning of the regulations.

In attempting to discern the meaning and scope of the NRC provisions dealing with the trustworthiness and reliability requirements, we find it significant that nowhere do they (or any other NRC provisions, for that matter) mention the offenses of adulteration or false denials of drug use. Furthermore, §§ 26.10 and 73.56 neither define the terms "trustworthy" and "reliable" nor do they offer examples of conduct which would place an employee in violation of these provisions. This, of course, is not determinative. The regulations must be considered in their entirety in order to determine whether Rando's behavior constitutes a violation of the NRC requirement that employees be trustworthy and reliable.

We do not believe that we can fairly read these regulations to say that Rando's conduct in connection with his drug test necessarily violates the provisions which require that employees be trustworthy and reliable. Put another way, the NRC regulations, both those dealing with the trustworthy and reliable requirement, as well as the regulatory scheme as a whole, cannot accurately be interpreted to preclude a finding that someone who acts as Rando acted could, nonetheless, be trustworthy and reliable as those terms are used by the Nuclear Regulatory Commission.

Indeed, surprising as it may seem, it is fair to say that the NRC regulations actually contemplate the rehabilitation of employees who act dishonestly, as Rando did. For the reasons we have earlier discussed, it is clear that the NRC regulations contemplate rehabilitation as a significant goal; they do so even at the risk of compromising public safety to some degree. It is quite apparent that the regulations do not limit the availability of rehabilitation only to those employees who voluntarily come forward and confess to their employer that they have a drug problem. Rather, a close examination of the regula-tions indicates that the NRC's rehabilitative approach to substance abuse is also applicable to employees who seek to conceal their drug problems, either by remaining quiet and hoping that a spot drug test will not expose their secret, or by adulterating a drug test and lying about having a drug problem.

This is apparent because of the presumption that absent evidence to the contrary, a positive test result indicates off-site drug use. In terms of public safety, it does not matter whether a nuclear employee takes drugs on plant premises or just before he comes to work. Had the NRC truly intended the elimination of drug use among nuclear employees as its chief goal, the presumption would operate the other way, placing the burden on the employee to show, at the very least, that a positive drug test was the result of off-site drug use and that his drug use presents no danger to the public.

Thus, much as we might desire to agree with the district court's analysis, we cannot fairly read the two provisions in the NRC regulations requiring that nuclear employees be trustworthy and reliable to mean that an employee who adulterates a drug test and falsely denies having a drug problem when initially confronted is categorically incapable of being regarded as trustworthy and reliable. This is particularly true where such an employee's actions are an inherent and inseparable part of his underlying drug problem, as is also the case with an employee who does not affirmatively step forward to admit his problem. Despite the dishonest nature of Rando's acts, those acts can be viewed as symptomatic of his drug problem, a problem for which the NRC regulations clearly contemplate rehabilitation as a viable management response. His behavior, while reprehensible, does not brand him an untrustworthy person as a matter of law. Nor can we fairly read the two provisions on which the Company relies as overriding the NRC's relatively sympathetic attitude toward the problem of drug abuse and its overall favorable approach to rehabilitation, even at the risk of having employees with undisclosed drug problems working at nuclear power plants. Accordingly, the district court erred in concluding that Rando's condi-

tional reinstatement was in conflict with public policy as defined by the NRC regulations.

Our conclusion is not changed by the Company's argument that there need not be an explicit law or governmental regulation prohibiting the remedy granted in an arbitration award for the award to be vacated on public policy grounds. In construing the public policy at issue in this case, the district court observed in a footnote that "[a]lthough public policy is to be determined by examining statutes and regulations, an arbitration award need not violate positive law or regulations before vacatur is appropriate." *International Bhd. of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.*, 950 F.Supp. 1227, 1234, n. 13 (N.D.N.Y.1996). In response, the Union argues that the award can be set aside "only if the arbitration panel's interpretation of the Agreement ... violate[s] some explicit public policy embodied in [the NRC] regulations." Appellant's Brief, p. 31. The Company directs the Court's attention to the fact that only two circuits, the District of Columbia and the Ninth Circuit, have adopted this more restrictive view. *See, e.g., Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 174 (9th Cir.1995); *Stead Motors v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200 (9th Cir.1989)(en banc); *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 808 F.2d 76, 83–84 (D.C.Cir.1987); *Postal Workers v. Postal Serv.*, 789 F.2d 1, 8 (D.C.Cir.1986). We need not adopt this narrow view because even the courts that have adopted a broader view have, nonetheless, drawn upon federal regulations where they exist as the principal source for the public policy to be applied. *See Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 363–64 (3d Cir.1993); *Iowa Elec. Light & Power Co. v. Local Union 204, IBEW*, 834 F.2d 1424, 1429 (8th Cir.1987); *Union Pacific R.R. v. United Transp. Union*, 3 F.3d 255, 261–62 (8th Cir. 1993). Indeed, the Company concedes that "[the] extensive regulation and involvement by the federal government in the area of nuclear safety obviously provides the source of a well-defined public policy favoring nuclear safety and requiring strict adherence to all nuclear safety rules." Appellee's Brief, p. 11. Accordingly, even if we accept the Company's argument that the NRC regulations are not conclusive and the absence of an explicit violation should not preclude vacatur of an award of reinstatement, we, nonetheless, look to these regulations as the primary evidence of the public policy at issue here.

Moreover, the Company points to no authority outside of the NRC regulations which would provide a basis for barring Rando's conditional reinstatement. As a realistic matter, therefore, we are left with the NRC regulations as the guideposts to defining the public policy at issue here and, under these regulations, no matter how broadly interpreted, we are still unable to say that the conditional reinstatement of Rando would necessarily violate the public policy promoting nuclear safety. As noted, the NRC regulations, concededly the prime source of public policy here, contemplate that rehabilitated substance abusers may be safely returned to employment at nuclear power facilities. Whether or not we would adopt the same policy, the soundness of this policy is not the issue before us because Congress has delegated this issue to the NRC, and not to the courts. We, therefore, conclude that the Panel's award of conditional reinstatement does not pose an "explicit conflict" with the public policy promoting nuclear safety. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 373–74, 98 L.Ed.2d 286 (1987).

(4)

Examining the case law of other circuits which have addressed the public policy implications of reinstating employees to safety-sensitive positions, we find nothing which contradicts the reasoning or result we reach here.

In *Iowa Elec. Light & Power Co. v. Local Union 204, Int'l Bhd. of Elec. Workers*, 834 F.2d 1424 (8th Cir.1987), the Eighth Circuit case on which the district court heavily relied, and indeed, the one most factually analogous to the instant case, a machinist working in a nuclear plant's secondary containment area was terminated for deliberately violating a safety regulation. The employee's work area was kept pressurized through a series of interlock doors to ensure

that any leakage would remain within the plant. The employee, whose leg was in a cast, wished to leave his shift early in order to avoid the lunch crowd. The employee requested permission from the control room to defeat the interlock system so that he might exit the area. Despite an explicit denial of this request by the control room engineer, the employee directed a foreman to disengage the fuse, thereby causing the door to open. The employee was terminated but the arbitrator ordered the company· to reinstate him, finding that his termination was too severe a penalty. According to the arbitrator, the employee did not know that "the situation was as grave a matter as that claimed by the company" and "the various training sessions ... did not address the door problem ... that specifically." *Id.* at 1426 (internal quotations omitted).

The district court vacated the arbitration award on public policy grounds. The Eighth Circuit affirmed, stating that the employee's "violation of the safety rule was serious[,]" and that "he deliberately ... defeat[ed] the interlock system, thereby committing a knowing violation of a safety rule—for. no better reason than that he wanted to get an early start on lunch." *Id.* at 1429–30. · The Eighth Circuit also stressed that the employee was aware that he was "short-circuiting an important safety system required by the federal government as a measure to protect the public from exposure to harmful radiation." *Id.* at 1426.

Two important factors distinguish the facts of *Iowa Electric* from those of the case presently before us. First, in *Iowa Electric*, the NRC was notified of the employee's safety violation and issued an inspection report that approved the company's discharge of the· employee. *See id.* at 1428. Thus, the NRC itself, the agency responsible for creating the regulations which govern safety in the nuclear industry, expressly validated the company's decision to terminate the employee. This is not the situation in the case before us. Not only has the NRC not endorsed Niagara Mohawk's decision to discharge Rando, but the NRC guidelines themselves actually con-. template reinstatement as a viable management response to a positive drug test result.

Second, the Eighth Circuit emphasized the limited nature of its holding in *Iowa Electric*, stating: "[W]e conclude that [the] strong public policy [requiring strict adherence to nuclear safety rules] would be violated by judicial enforcement of an arbitrator's award requiring the reinstatement of an employee who acted as [this employee] did under the circumstances of this case." *Id.* at 1427. The court explained that its decision in *Iowa Electric* "should not be read as ·a blanket justification for the discharge of every employee who breaches a public safety regulation at a nuclear power plant. There may be circumstances under which a violation might be excused."· *Id.* at 1429 (footnote omitted).

· In the case before us, a decision to vacate the arbitration panel's award would amount to a blanket holding that any nuclear employee who adulterates a drug test, who tests positive for cocaine, and who, when initially confronted, denies that he has a substance abuse problem, is incapable of being safely restored to his or her position on the ground that such an employee is incapable of being trusted. There is nothing within the NRC guidelines which supports such a sweeping conclusion. As previously stated, we find it significant that the NRC guidelines specify only the minimum penalty of a two week suspension for an initial positive test result, and that they do not even address the issues of adulteration or false denials of substance abuse. Therefore, the NRC has not evinced an intent to categorically bar an employee who acted as Rando did from re-employment within the nuclear industry. ·

In *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665 (11th Cir.1988), the Eleventh Circuit examined the public policy exception in the context of the reinstatement of an airline pilot who had been discharged for flying a. passenger plane while intoxicated, in contravention of both Delta rules and Federal Aviation Administration ("FAA") regulations. Although the arbitration panel conceded that the employee in question had committed a dischargeable offense, it found, albeit somewhat ambiguously, that there was no just cause for his discharge. The district court vacated the award, finding that enforcement of the award "would violate clearly

established public policy against allowing pilots of airliners to operate aircraft while under the influence of alcohol." *Id.* at 669. The Eleventh Circuit affirmed, concluding that it was faced with the rare example of an arbitration award that would violate public policy, but not without stressing the limited function of a court in reviewing an arbitration award. *See id.* at 670. Citing the statutes and case law of numerous states, as well as FAA regulations, the court found a "clearly established public policy which condemns the operation of passenger airliners by pilots who are under the influence of alcohol." *Id.* at 671. Of particular significance, however, is the unqualified nature of the reinstatement in *Delta Air Lines.* The arbitration award simply ordered the employee's outright reinstatement, taking no account of the public danger involved. For this reason, *Delta Air Lines* provides an example of a situation in which the enforcement of the award would present a definite, ongoing danger to public safety and, thus, clearly would violate public policy as defined by the FAA.

By contrast, in *Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 808 F.2d 76 (D.C.Cir.1987), there was, as there is here, a conditional reinstatement, which the District of Columbia Circuit upheld. In *Northwest Airlines,* a pilot reported to work and operated a passenger aircraft while under the influence of alcohol. The pilot was discharged for violating company regulations prohibiting the consumption of alcohol within twenty-four hours of flight duty and for being under the influence of alcohol during the flight. *Id.* at 78. The arbitration board held that the discharge was without cause and ordered that the employee be offered reinstatement, without back pay or benefits, "at such time as the Federal Air Surgeon certified that he met [applicable FAA] standards." *Id.* at 79. The employee was subsequently certified by the FAA. Northwest filed a complaint in district court seeking to set aside the award. The district court vacated, finding the arbitration board's remedy "inconsistent with the federal duty imposed on airlines to ensure airline safety." *Id.* at 80. The District of Columbia Circuit reversed, stressing that the arbitration board's decision "merely required Northwest to reinstate [the employee] *if and when* he was recertified by the FAA as fully fit and licensed to fly." *Id.* at 83 (emphasis added). The court of appeals further found that "Northwest has a policy of allowing reformed alcoholics to fly as pilots, and there is nothing in the law prohibiting such a result." *Id.* Emphasizing that the public policy exception is narrowly drawn "so as to limit potentially intrusive judicial review of arbitration awards under the guise of 'public policy,'" the court of appeals concluded that "it would be patently absurd for us … to reverse an arbitration award that is expressly limited by deference to the … agency that is charged with the enforcement of the public policy here at issue." *Id.* at 83–84.

While the arbitration award providing for Rando's reinstatement was not conditioned upon a specific ratification by the NRC, it was conditioned upon his passing a drug test, as well as his compliance with numerous other safety precautions to be taken by the Company at its discretion, including subsequent drug testing under observation. It certainly cannot be said that the enforcement of an award which is on its face conditional, precisely so as to assure that public safety will not be compromised, poses a clear threat to the public policy favoring safety in the nuclear industry. Furthermore, it is evident from both the NRC guidelines and Niagara Mohawk's Joint Fitness Program that, similar to Northwest Airlines, Niagara Mohawk has a policy of allowing rehabilitated substance abusers to work within protected areas of the nuclear facility. As such, there is nothing in the law prohibiting the result reached by the arbitration panel in this case. A refusal to enforce the award providing for Rando's conditional reinstatement would thus involve the very type of "intrusive judicial review" of which the District of Columbia Circuit spoke in *Northwest Airlines. See* 808 F.2d at 83 (citing *W.R. Grace & Co. v. Local 759, Int'l Union of Rubber, Cork, Linoleum & Plastic Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983)).

Several other circuit decisions have upheld arbitration awards calling for the reinstatement of employees, in some cases to safety-sensitive positions. *See Daniel Constr. Co. v.*

*Local 257, Int'l Bhd. of Elec. Workers,* 856 F.2d 1174 (8th Cir.1988) (arbitrator's decision to reinstate employee of nuclear power plant who had been discharged for failing psychological test upheld as not against public policy). *See also Stead Motors v. Automotive Machinists Lodge No. 1173, Int'l Ass'n of Machinists,* 886 F.2d 1200 (9th Cir.1989)(en banc)(award providing for reinstatement of employee mechanic discharged for failing to tighten lug nuts upheld); *E.I. DuPont de Nemours and Co. v. Grasselli Employees Indep. Assoc.,* 790 F.2d 611 (7th Cir.1986)(arbitrator's determination that employee who suffered mental breakdown and attempted to create a dangerous chemical reaction could be safely reinstated upheld). While the facts of these cases differ, these courts have consistently stressed the necessity of demonstrating that the enforcement of an arbitration award would clearly violate the public policy at issue if such an award is to be vacated.

(5)

██ The district court based its conclusion that the Company's compliance with the Panel's award would violate public policy in part upon a finding that a "reasonable person in the grievant's employment position would be on notice that violating the federally mandated drug policy set forth by Niagara Mohawk, adulterating a urine sample, falsifying a certification that he would not adulterate his urine sample, and falsely denying illegal drug use could result in termination." *Id.* The district court stated that "[a]lthough reviewing courts must ordinarily accept an arbitrator's findings of fact, in addressing public policy concerns, the courts are not to defer to the arbitrator, but rather consider these issues de novo." *Id.* at 1232 (citing *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 373–74, 98 L.Ed.2d 286 (1987); *W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber, Cork, Linoleum & Plastic Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183–84, 76 L.Ed.2d 298 (1983)). Were it open to us to decide the issue, we might well agree with the district court's proposition, but it is, in our view, foreclosed by the Supreme Court authority cited by the district court. While the question of whether Rando's conduct violated public policy was properly before the district court, and although we disagree with the district court's ultimate determination on that issue, our reading of *Misco* and *W.R. Grace* indicates that neither reasonably supports the district court's assertion that it had the authority to make *de novo* findings of fact.

As we have previously noted, the decision in *W.R. Grace* did not grant a district court authority to second-guess the arbitrator's fact-finding or reasoning. *See Misco,* 484 U.S. at 43, 108 S.Ct. at 373–74. And the Supreme Court in *Misco* was clear in emphasizing that the fact that a court is conducting a public policy analysis does not "excuse a court for doing the arbitrator's task." 484 U.S. at 45, 108 S.Ct. at 374–75. Indeed, the very facts of *Misco* demonstrate the Supreme Court's rejection of the notion that a reviewing court may intrude upon the arbitrator's sphere by engaging in its own fact-finding mission.

In *Misco,* the Court considered the Fifth Circuit's decision affirming the district court's vacatur of an arbitration award. An employee responsible for operating a hazardous machine in a papermill was observed by police in the company parking lot in a car filled with marijuana smoke and containing a burning marijuana cigarette in the ashtray. The company terminated the employee for violating a company rule that prohibited employees from bringing intoxicants or narcotics onto company property or consuming them on company property. The arbitrator ordered the company to reinstate the employee, finding the evidence insufficient to establish that the employee had actually used or possessed marijuana on company property. The district court reversed the award and the Fifth Circuit affirmed, holding that reinstatement of the employee would violate the public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." *Misco,* 484 U.S. at 34–35, 108 S.Ct. at 368–69 (internal quotations and citation omitted).

The Supreme Court reversed, finding that the Fifth Circuit had failed to identify a

specific public policy violation. The Court first noted that the Fifth Circuit had not formulated its conception of a public policy from existing laws and precedents, but had relied instead on its own considerations of the public interest. Second, the Court held that even if the Fifth Circuit had succeeded in establishing a public policy against the operation of dangerous machinery by persons under the influence of drugs or alcohol, it had engaged in impermissible fact-finding in order to find a violation of this policy. *See id.* at 44–45, 108 S.Ct. at 374–75. The Court explained that in reviewing *de novo* the facts of the case, the Fifth Circuit had inappropriately inferred that the employee in question had in fact used drugs on company property and would do so again in the future while operating dangerous machinery. *See id.* Because the arbitrator had made no such findings, and because it was inappropriate for the court of appeals itself to draw such inferences, the Court held that the Fifth Circuit had overstepped its authority to vacate the award on public policy grounds:

> The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them who had more opportunity to observe [the grievant] and to be familiar with the [situation]. *Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task.*

*Misco,* 484 U.S. at 45, 108 S.Ct. at 374–75 (emphasis added).

Thus, although the Court in *Misco* reiterated that "the question of public policy is ultimately one for resolution by the courts," 484 U.S. at 43, 108 S.Ct. at 373–74, nothing in its holding or that of *W.R. Grace* authorizes a reviewing court to conduct a *de novo* review of the facts considered by the arbitrator in the course of fashioning an award. To the contrary, *Misco* clearly demonstrates the Supreme Court's intent that a reviewing court answer the public policy question within the parameters of the arbitrator's interpretation of the facts.

It is evident that the district court here reviewed the events leading up to Rando's discharge and reached factual conclusions contrary to those reached by the Panel concerning whether Rando should have been on notice that his actions could result in discharge. Indeed, prior to making these factual conclusions, the district court asserted that "[g]iven the strong public policy issues involved, the Court will review the findings of the arbitration panel de novo." *Niagara Mohawk,* 950 F.Supp. at 1234. As previously stated, while findings as to questions of law, *i.e.,* public policy questions, are subject to *de novo* review by a district court, an arbitrator's factual findings clearly are not. Thus, the district court's statement that "[a]lthough reviewing courts must ordinarily accept an arbitrator's findings of fact, in addressing public policy concerns, the courts are not to defer to the arbitrator, but rather consider these issues de novo" is not one which can be reasonably deduced from *Misco* or *W.R. Grace* as the district court suggests. *See* 950 F.Supp. at 1232.

■ The district court's determination that a reasonable person in Rando's position would be on notice that his acts of adulterating a drug test and denying a substance abuse problem would result in termination was contrary to the one reached by the Panel, which had explicitly found that such an employee would not be not on notice that his actions would necessarily result in discharge. Examining the consent form signed by Rando at the time he provided his sample, the Panel emphasized that the form put an employee on notice only of the fact that an altered sample might result in the employee being required to undergo a second test under observation, a consequence that the Panel considered antithetical to the Company's claim that tampering with a sample is an offense warranting summary dismissal under the Company's policy. Notwithstanding the Panel's analysis, the district court supported its conclusion that a reasonable person in Rando's position would be on notice that discharge was a possible consequence of his conduct by rejecting the Panel's distinction between insubordination and falsification with respect to Rando's adulteration of the drug test.[16]

---

**16.** The Panel had stated that while the Company argued that falsification "intrinsically warrants

██ We first note that the determination as to both the characterization of the offense and the proper remedy under the collective bargaining agreement is uniquely the province of the arbitrator. Thus, the district court was not empowered to reject the Panel's characterization of Rando's offense to reach a contrary conclusion concerning whether he was on notice that he might be terminated for "adulterating a urine sample, falsifying a certification that he would not adulterate his urine sample, and falsely denying illegal drug use." *Niagara Mohawk,* 950 F.Supp. at 1236. In substituting its own judgment for that of the Panel on this factual determination, one which involved an interpretation of the collective bargaining agreement, the district court exceeded its reviewing authority.

██ Second, while this distinction between insubordination and falsification is, in our view, somewhat artificial, the outcome should not be affected by the classification. Even if the label affixed to the offense is "falsification," the Panel's determination that Rando was discharged without just cause is one that arises from a legitimate exercise of its power to interpret the collective bargaining agreement. As such, the district court erred in reexamining the facts, inferences, and conclusions upon which the Panel rested its award. "[T]he fact that it is inquiring into a possible violation of public policy [does not] excuse a court for doing the arbitrator's task." *Misco,* 484 U.S. at 45, 108 S.Ct. at 374. The only proper question before the district court was whether the award arising out of the Panel's factual findings and contractual interpretation "actually violate[s]" public policy. *See Misco,* 484 U.S. at 44, 108 S.Ct. at 374–75; *W.R. Grace,* 461 U.S. at 766, 103 S.Ct. at 2183–84; *Daniel Constr. Co. v. Local 257, Int'l Bhd. of Elec. Workers,* 856 F.2d 1174, 1181 (8th Cir.1988); *Iowa Elec. Light & Power Co. v. Local Union 204, Int'l Bhd. of Elec. Workers,* 834 F.2d 1424, 1427 (8th Cir.1987). For the reasons discussed above, we find that the award here does not.

## Conclusion

Although we reverse, we are not unsympathetic to the reaction of the district court to the Panel's award. In terms of danger to public safety, we see little difference between a nuclear employee who conceals a drug addiction from his employer by failing to disclose it, and one who conceals such a problem by affirmatively attempting to mislead his employer. In either case the risk to public safety is the same and the underlying problem is not deception, but rather drug use, which needs to be addressed. Optimally, the employee will voluntarily come forward and avail himself of the Company's Employee Assistance Program. If he does not, dismissal ought to be a viable alternative. What might be tolerable in a work environment involving minimal risk to the public ought not to be acceptable in a workplace where protection of the public must take precedence and there is little room for error.

The problem here is two-fold. First, for whatever reason, the Company acquiesced in a Joint Fitness for Duty Program that did not provide it with sufficient authority to discharge an employee who not only fails to come forward and seek help for his drug problem, but also actively attempts to conceal that problem from his employer by adulterating his drug test. Second, the Nuclear Regulatory Commission, the policy maker here, has chosen not to confront this issue directly. On one level it appears to take a tough approach, as in its regulation requiring a minimum of five years suspension for on-site drug use. *See* 10 C.F.R. § 26.27(b)(3). When examined closely, however, this regulatory scheme turns out to be far less forceful than it appears at first glance, as is evidenced by the presumption that a positive drug test result implies off-site use only, a

discharge," the Joint Program made the giving of an adulterated sample a ground for retesting, rather than for discharge. *See* O & D at 9. Moreover, the Panel stated that the Company itself in describing adulteration treated it as equivalent to insubordination and that unlike falsification, insubordination does not always impugn the employee's character and does not always result in discharge. *See id.* at 10. The Panel found that "[w]hereas falsification calls into question an employee's integrity, insubordination is typically a matter of degree and context." *Id.*

highly dubious provision that effectively vitiates the regulation against on-site use.

Having said this, we are, nonetheless, bound to uphold an arbitration award that does not squarely contradict public policy as defined by the Nuclear Regulatory Commission regulations. The judgment of the district court vacating the arbitration award is reversed.