**DYNO NOBEL, INC., Plaintiff,**

v.

**UNITED STEEL WORKERS OF AMERICA and its Local 13226, Defendants.**

**No. 98–CV–1685.**

United States District Court, N.D. New York.

Dec. 9, 1999.

Joseph C. Dole, Bond, Schoeneck Law Firm, Syracuse, NY, for Plaintiff.

Joel Field, Office of Joel Field, White Plains, NY, for Defendants.

## MEMORANDUM—DECISION AND ORDER

KAHN, District Judge.

This case involves an employer's attempt to vacate an arbitration award to a former employee. Presently before the Court are (i) defendant United Steelworkers, Local 13226's ("Local 13226") motion to dismiss the complaint, (ii) defendant Local 13226's motion to confirm the arbitration award, and (iii) Plaintiff's motion for summary judgment. For the reasons set forth below, defendant Local 13226's motions are granted and Plaintiff's motion denied.

### I. BACKGROUND

Plaintiff is a multi-national corporation engaged in the manufacture and sale of explosives, explosive devices, and hazardous chemicals. It owns and operates a manufacturing plant in Port Ewen, New York. Defendants United Steelworkers of America and Local 13226 are the collective bargaining representatives of the hourly-paid production and maintenance employees at the Port Ewen plant.

Plaintiff and Defendants are parties to a collective bargaining agreement governing the terms and conditions of employment for represented employees at the Port Ewen facility (the "Agreement"). Article V of the Agreement delineates a procedure for dispute resolution, the final step of which is binding arbitration. Article V, 6(B) prohibits an arbitrator from adding to the terms of the Agreement, and Article III provides Plaintiff with the right to discharge employees for "proper cause."

The dispute in this case arose from Plaintiff's discharge of Norman Buzzanco, an employee at the Port Ewen facility, for what Plaintiff alleges were "repeated safe-

ty violations." Buzzanco was hired on May 3, 1990, at which time Plaintiff furnished him with a booklet governing safety rules and practices. The booklet required him to observe the standing operating procedures and specific rules for his work area. Various infractions followed, resulting in written and verbal warnings. On May 23, 1995, Buzzanco received a five day suspension for failing to verify a set up sheet for the press that was running in the Plug Press Room. The suspension notice advised Buzzanco that further violations could result in termination.

On January 8, 1998, Buzzanco was working in the Fuse Press Room, where a block of 499 fuses are installed in a block of 499 detonator shells. These detonators are used in the construction and mining industries. If the alignment is not correct at the time of installation, the situation becomes literally explosive. Buzzanco was responsible for confirming proper setup of the press before beginning a new operation, and certifying his verification in writing. Richard Dyson, a co-employee, was responsible for changing the press height, and failed to do properly on this date. Buzzanco did not detect the error, and the press jammed, but fortunately no explosion occurred. Plaintiff conducted an investigation, and Buzzanco admitted that he had not checked the press height and his written verification was therefore false. Plaintiff terminated Buzzanco's employment effective January 12, 1998.

Defendants filed a grievance, which Plaintiff denied, and an arbitration was ultimately held before Michael S. Lewandowski in Kingston, New York. Lewandowski issued his Opinion and Award (the "Award") on September 30, 1998, in which he concluded that Buzzanco had committed the safety violation charges; that Buzzanco had referred to the violation as "what's the big deal"; that the safety violation created a potential for explosion; that Plaintiff had clear safety procedures in force; that a past set-up error had resulted in an explosion; and that Buzzanco had committed similar safety violations in the past.

Despite these findings, the arbitrator concluded that discharge was too severe a penalty for Buzzanco's infraction and ordered his reinstatement after a two month suspension without pay. Lewandowski reasoned that more than three years had passed since Buzzanco had been disciplined for any violation, and in that time he had been error-free. He also observed that Plaintiff did not act consistently in disciplining employees for the type of conduct at issue here. Rather than comply, Plaintiff commenced this action.

## II. ANALYSIS

### A. Motion to Dismiss and Confirm the Arbitration Award

#### 1. General Standard Governing Judicial Review of Arbitration Awards

■ As is standard practice in agreements between a union and a company, the parties in this case agreed to have their disputes settled by a neutral arbitrator and to accept the arbitrator's findings of fact and interpretation of their contract. Alternative dispute resolution of this kind fulfills the intent of the Labor–Management Relations Act of 1947,. which established "a clear preference for the private resolution of labor disputes without government intervention." *Int'l Brotherhood of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 714 (2d Cir.1998) ("*Niagara Mohawk I*"). Because "[t]he federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of [arbitration] awards," *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), an arbitrator's award resolving a labor dispute "is legitimate and enforceable as long as it 'draws its essence from the collective bargaining agreement' and is not merely an exercise of the arbitrator's 'own brand of industrial justice.' " *Niagara Mohawk*, 143 F.3d at 714. Ac-

cordingly, the Supreme Court has made clear that a reviewing court is bound by the arbitrator's factual findings, interpretation of the contract and suggested remedies. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37–38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). Generally speaking, unless the award is procured through fraud or dishonesty, the decision should not be disturbed. *See id.*, at 38, 108 S.Ct. 364.

The result is that the "contractual theory of arbitration ... requires a reviewing court to affirm an award it views as incorrect—even very incorrect—so long as the decision is plausibly grounded in the parties' agreement." *Wackenhut Corp. v. Amalgamated Local 515*, 126 F.3d 29, 32 (2d Cir.1997); *Saint Mary Home v. Service Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 44 (2d Cir.1997). Thus, parties that have agreed to submit their disputes to arbitration must accept the arbitrator's view of the facts and interpretation of the contract. *See Misco*, 484 U.S. at 38, 108 S.Ct. 364.

### 2. Public Policy Exception

While Plaintiff states that the parties do not disagree about the general standards which the Court must apply in reviewing an arbitration award, it invokes the power of federal courts to overturn arbitration awards that violate public policy first recognized by the Supreme Court in *W.R. Grace and Co. v. Local Union 759, Int'l Union of Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). Courts have greatly narrowed the availability of the public policy exception, acknowledging that frequent judicial intervention in the arbitral process would undermine the speedy resolution of grievances by freely negotiated private mechanisms. Consequently, a court may vacate an arbitral award on public policy grounds only if it can "demonstrate that the policy is one that specifically militates against the relief ordered by the arbitrator." *Niagara Mohawk I*, 143 F.3d at 716 (quot-

ing *Stead Motors v. Automotive Machinists Lodge No. 1173*, 886 F.2d 1200, 1212–13 (9th Cir.1989) (en banc)). "Public policy," in this context, "is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " *W.R. Grace*, 461 U.S. at 766, 103 S.Ct. 2177. In short, this Court cannot infer from the mere fact of regulation that any infraction constitutes a public policy violation, or any company operating in a regulated industry could overturn an undesirable arbitral outcome and thereby undermine the entire system of privately negotiated dispute resolution mechanisms.

Plaintiff makes a broad reference to the public policy requiring Plaintiff and its employees to maintain a safe workplace. To establish that policy, Plaintiff, in addition to referencing New York State regulations, cites three sources of federal regulation: the Occupational Safety and Health Administration; the Bureau of Alcohol Tobacco and Firearms; and the Department of Transportation. The OSHA regulations implicated here are the process set-up and written verification procedure that Buzzanco's actions on January 28, 1998, completely violated. *See* 29 C.F.R. §§ 1910.109(k)(2), 1910.119(e), and 1910.119(f). Similarly, the state regulations that Plaintiff cites relate to safe operation of explosive plants and mandate compliance with all safety procedures. *See* 12 N.Y.C.R.R. § 39.

■ The Second Circuit recently addressed the public policy exception in *Int'l Brotherhood of Elec. Workers, Local 97 v. Niagara Mohawk Power Corp.*, 196 F.3d 117 (2d Cir.1999) ("*Niagara Mohawk II*"), which dealt with an arbitral award restoring an individual characterized by the trial court as "unreliable" and "untrustworthy" as a nuclear security officer. The court in *Niagara Mohawk II* noted that the employer never reported the discharged worker to any agency, and thereby failed to receive any clear guidance as to the degree to which his wrongdoing offended

public policy. *See id.,* 196 F.3d at 127–28. The Second Circuit noted that a court could not subjectively determine "public policy" from "general considerations of supposed public interests." *See id.* Instead, the court examined regulations that asserted the same general pronouncements concerning the need for safety and specific regulations establishing compliance procedures with which this Court is confronted today. Following that review, the court concluded *inter alia* that reinstatement did not violate public policy absent any precedent that the promulgating agencies' would have had deemed reinstatement a violation. *See id.,* 196 F.3d at 127–28 ("the [regulatory agency]'s enforcement policy provides the strongest indication of the contours of the public policy implicated in the case"). Essentially, a party seeking to overturn an award must look to the enforcement policy of the agency whose regulations provide the prime source of the public policy to define the parameters of the public policy.

■ Plaintiff fails to provide such authority. Based upon the *Niagara Mohawk* cases, this Court cannot conclude unequivocally that the Award violates a clearly defined public policy of ensuring safety in the manufacture of explosives. There does not appear to be a consistent pattern of intentional violations, and the evidence introduced at the arbitration revealed that Plaintiff reviews an employee's past record of performance in determining whether to terminate or impose a lesser penalty. Significantly, every instance of similar misconduct in the past resulted in lesser penalties, unless it persisted. Here, Buzzanco was apparently error-free for the three years prior to events on January 8, 1998. Of course, a more reasonable approach might be that the immense physical danger to co-workers and Plaintiff's plant attributable to Buzzanco on January 8, 1998, coupled with his Homer Simpson—like "what's the big deal" response, merits his dismissal, but Second Circuit precedent and the policy in favor of arbitration dictates a different result. *See Local 453, Int'l Brotherhood· of Elec.*

*Workers v. Otis Elevator,* 314 F.2d 25, 28 (2d Cir.1963) ("Having bargained for the decision of the arbitrator on the question of whether [the employee's] conduct ... constituted 'just cause' for discharge, the parties are bound by it, even if it be regarded as unwise or wrong on the merits."). However regrettable the Award, it is not reversible.

### B. Plaintiff's Motion for Summary Judgment

For the reasons discussed above, Plaintiff's motion is denied.

### III. CONCLUSION

Accordingly, it is hereby

ORDERED that defendant Local 13226's motion to dismiss the complaint is GRANTED;

ORDERED that defendant Local 13226's motion to confirm the arbitration award is GRANTED;

ORDERED that Plaintiff's motion for summary judgment is DENIED;

FURTHER ORDERED that the Clerk of the Court serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.